355 So.2d 1186 (1978)
The FLORIDA BAR, Petitioner,
v.
Marilyn R. BRUMBAUGH, Respondent.
No. 48803.
Supreme Court of Florida.
January 10, 1978.
Rehearing Denied April 5, 1978.
*1189 R. Layton Mank, Chairman, Standing Unauthorized Practice of Law Committee, Miami, Richard C. McFarlain, Asst. Director-Legal, Tallahassee, Young Joe Simmons, Counsel, Ocala and William B. Wiley and John A. Weiss, Asst. Staff Counsels, Tallahassee, for The Florida Bar, petitioner.
Marilyn R. Brumbaugh, in pro. per.
PER CURIAM.
The Florida Bar has filed a petition charging Marilyn Brumbaugh with engaging in the unauthorized practice of law, and seeking a permanent injunction prohibiting her from further engaging in these allegedly unlawful acts. We have jurisdiction under our constitutional authority to adopt rules for the practice and procedure in all the courts of this state. Article V, Section 2(a), Florida Constitution (1968). We now those acts of respondent which we deem to constitute the unauthorized practice of law, and ordering her to stop such activities.
Respondent, Marilyn Brumbaugh, is not and has never been a member of the Florida Bar, and is, therefore, not licensed to practice law within this state. She has advertised in various local newspapers as "Marilyn's Secretarial Service" offering to perform typing services for "Do-It-Yourself" divorces, wills, resumes, and bankruptcies. The Florida Bar charges that she performed unauthorized legal services by preparing for her customers those legal documents necessary in an uncontested dissolution of marriage proceeding and by advising her customers as to the costs involved and the procedures which should be followed in order to obtain a dissolution of marriage. For this service, Ms. Brumbaugh charges a fee of $50.
Of course, we must determine whether the Florida Bar has presented sufficient evidence in the record before us to prove that respondent has engaged in the unauthorized practice of law. But, in cases such as this, the Florida Supreme Court is not confined to act solely in its judicial capacity. In addition, it acts in its administrative capacity as chief policy maker, regulating the administration of the court system and supervising all persons who are engaged in rendering legal advice to members of the general public. Such authority carries with it the responsibility to perform this task in a way responsive to the needs and desires of our citizens. This principle has long been our goal. In State v. Sperry, 140 So.2d 587, 595 (Fla. 1962), we noted:
The reason for prohibiting the practice of law by those who have not been examined and found qualified to practice is frequently misunderstood. It is not done to aid or protect the members of the legal profession either in creating or maintaining a monopoly or closed shop. It is done to protect the public from being advised and represented in legal matters by unqualified persons over whom the judicial department can exercise little, if any, control in the matter of infractions of the code of conduct which, in the public interest, lawyers are bound to observe.
The Florida Bar as an agent of this Court, plays a large role in the enforcement of court policies and rules and has been active in regulating and disciplining unethical conduct by its members. Because of the natural tendency of all professions to act in their own self interest, however, this Court must closely scrutinize all regulations tending to limit competition in the delivery of legal services to the public, and determine whether or not such regulations are truly in the public interest. Indeed, the active role of state supreme courts in the regulation of the practice of law (when such regulation is subject to pointed reexamination by the state court as policy maker) is accorded great deference and exemption from federal interference under the Sherman Act. Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977).
*1190 The United States Supreme Court has recently decided issues which may drastically change the practice of law throughout the country, especially with regards to advertising and price competition among attorneys. Bates v. State Bar of Arizona, supra; Goldfarb, et al. v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In addition, the Supreme Court has affirmed the fundamental constitutional right of all persons to represent themselves in court proceedings, Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In Faretta, the Supreme Court emphasized that an attorney is merely an assistant who helps a citizen protect his legal rights and present his case to the courts. A person should not be forced to have an attorney represent his legal interests if he does not consent to such representation. It is imperative for us to analyze these cases and determine how their holdings and the policies behind them affect our regulation of the legal profession in this state.
With regard to the charges made against Marilyn Brumbaugh, this Court appointed a referee to receive evidence and to make findings of fact, conclusions of law, and recommendations as to the disposition of the case. The referee found that respondent, under the guise of a "secretarial" or "typing" service prepares, for a fee, all papers deemed by her to be needed for the pleading, filing, and securing of a dissolution of marriage, as well as detailed instructions as to how the suit should be filed, notice served, hearings set, trial conducted, and the final decree secured. The referee also found that in one instance, respondent prepared a quit claim deed in reference to the marital property of the parties. The referee determined that respondent's contention that she merely operates a typing service is rebutted by numerous facts in evidence. Ms. Brumbaugh has no blank forms either to sell or to fill out. Rather, she types up the documents for her customers after they have asked her to prepare a petition or an entire set of dissolution of marriage papers. Prior to typing up the papers, respondent asks her customers whether custody, child support, or alimony is involved. Respondent has four sets of dissolution of marriage papers, and she chooses which set is appropriate for the particular customer. She then types out those papers, filling in the blank spaces with the appropriate information. Respondent instructs her customers how the papers are to be signed, where they are to be filed, and how the customer should arrange for a final hearing.
Marilyn Brumbaugh, who is representing herself in proceedings before this Court, has made various objections to the procedure and findings of fact of the referee. Respondent alleges that the referee has an inherent conflict of interest because he is a lawyer and a member of The Florida Bar. She asserts that "all lawyers have a property interest in this case, because they have been making money, running typing services, without proper licenses." She further alleges that the referee did not provide her with a proper hearing, that he threw her in jail for pleading the Fifth Amendment, and denied her her constitutional right to a jury trial. Respondent argues that she has never held herself out as an attorney, and has never professed to have legal skills. She does not give advice, but acts merely as a secretary. She is a licensed counselor, and asserts the right to talk to people and to let her customers make decisions for themselves. Finally, respondent contends that her civil rights have been violated, and that she has been denied the right to make an honest living.
This case does not arise out of a complaint by any of Ms. Brumbaugh's customers as to improper advice or unethical conduct. It has been initiated by members of The Florida Bar who believe her to be practicing law without a license. The evidence introduced at the hearing below shows that none of respondent's customers believed that she was an attorney, or that she was acting as an attorney in their behalf. Respondent's advertisements clearly addressed themselves to people who wish to do their own divorces. These customers knew that they had to have "some type of papers" to *1191 file in order to obtain their dissolution of marriage. Respondent never handled contested divorces. During the past two years respondent has assisted several hundred customers in obtaining their own divorces. The record shows that while some of her customers told respondent exactly what they wanted, generally respondent would ask her customers for the necessary information needed to fill out the divorce papers, such as the names and addresses of the parties, the place and duration of residency in this state, whether there was any property settlement to be resolved, or any determination as to custody and support of children. Finally, each petition contained the bare allegation that the marriage was irretrievably broken. Respondent would then inform the parties as to which documents needed to be signed, by whom, how many copies of each paper should be filed, where and when they should be filed, the costs involved, and what witness testimony is necessary at the court hearing. Apparently, Ms. Brumbaugh no longer informs the parties verbally as to the proper procedures for the filing of the papers, but offers to let them copy papers described as "suggested procedural education."
The Florida Bar argues that the above activities of respondent violate the rulings of this Court in The Florida Bar v. American Legal and Business Forms, Inc., 274 So.2d 225 (Fla. 1973), and The Florida Bar v. Stupica, 300 So.2d 683 (Fla. 1974). In those decisions we held that it is lawful to sell to the public printed legal forms, provided they do not carry with them what purports to be instructions on how to fill out such forms or how to use them. We stated that legal advice is inextricably involved in the filling out and advice as to how to use such legal forms, and therein lies the danger of injury or damage to the public if not properly performed in accordance with law. In Stupica, supra, this Court rejected the rationale of the New York courts in New York County Lawyer's Association v. Dacey, 28 A.D.2d 161, 283 N.Y.S.2d 984, reversed and dissenting opinion adopted 21 N.Y.2d 694, 287 N.Y.S.2d 422, 234 N.E.2d 459 (N.Y. 1967), which held that the publication of forms and instructions on their use does not constitute the unauthorized practice of law if these instructions are addressed to the public in general rather than to a specific individual legal problem. The Court in Dacey stated that the possibility that the principles or rules set forth in the text may be accepted by a particular reader as solution to his problem, does not mean that the publisher is practicing law. Other states have adopted the principle of law set forth in Dacey, holding that the sale of legal forms with instructions for their use does not constitute unauthorized practice of law. See State Bar of Michigan v. Cramer, 399 Mich. 116, 249 N.W.2d 1 (1976); Oregon State Bar v. Gilchrist, 272 Or. 552, 538 P.2d 913 (1975). However, these courts have prohibited all personal contact between the service providing such forms and the customer, in the nature of consultation, explanation, recommendation, advice, or other assistance in selecting particular forms, in filling out any part of the forms, suggesting or advising how the forms should be used in solving the particular problems.
Although persons not licensed as attorneys are prohibited from practicing law within this state, it is somewhat difficult to define exactly what constitutes the practice of law in all instances. This Court has previously stated that:
... if the giving of such advice and performance of such services affect important rights of a person under the law, and if the reasonable protection of the rights and property of those advised and served requires that the persons giving such advice possess legal skill and a knowledge of the law greater than that possessed by the average citizen, then the giving of such advice and the performance of such services by one for another as a course of conduct constitute the practice of law.
Sperry, supra, 140 So.2d at 591.
This definition is broad and is given content by this Court only as it applies to specific circumstances of each case. We agree that "any attempt to formulate a *1192 lasting, all encompassing definition of `practice of law' is doomed to failure `for the reason that under our system of jurisprudence such practice must necessarily change with the everchanging business and social order.'" State Bar of Michigan v. Cramer, supra, 399 Mich. 116, 249 N.W.2d at 7.
In determining whether a particular act constitutes the practice of law, our primary goal is the protection of the public. However, any limitations on the free practice of law by all persons necessarily affects important constitutional rights. Our decision here certainly affects the constitutional rights of Marilyn Brumbaugh to pursue a lawful occupation or business. Prior v. White, 132 Fla. 1, 180 So. 347 (1938); State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394 (1936); State ex rel. Davis v. Rose, 97 Fla. 710, 122 So. 225 (1929). Our decision also affects respondent's First Amendment rights to speak and print what she chooses. In addition, her customers and potential customers have the constitutional right of self representation, Faretta, supra, and the right of privacy inherent in the marriage relationship, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). All citizens in our state are also guaranteed access to our courts by Article I, Section 21, Florida Constitution (1968). Although it is not necessary for us to provide affirmative assistance in order to ensure meaningful access to the courts to our citizens, as it is necessary for us to do for those incarcerated in our state prison system, Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), we should not place any unnecessary restrictions upon that right. We should not deny persons who wish to represent themselves access to any source of information which might be relevant in the preparation of their cases. There are numerous texts in our state law libraries which describe our substantive and procedural law, purport to give legal advice to the reader as to choices that should be made in various situations, and which also contain sample legal forms which a reader may use as an example. We generally do not restrict the access of the public to these law libraries, although many of the legal texts are not authored by attorneys licensed to practice in this state. These texts do not carry with them any guarantees of accuracy, and only some of them purport to update statements which have been modified by subsequently enacted statutes and recent case law.
The policy of this Court should continue to be one of encouraging persons who are unsure of their legal rights and remedies to seek legal assistance from persons licensed by us to practice law in this state. However, in order to make an intelligent decision as whether or not to engage the assistance of an attorney, a citizen must be allowed access to information which will help determine the complexity of the legal problem. Once a person has made the decision to represent himself, we should not enforce any unnecessary regulation which might tend to hinder the exercise of this constitutionally protected right. However, any restriction of constitutional rights must be "narrowly drawn to express only the legitimate state interests at stake." Roe v. Wade, supra, NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). "And if there are other reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a state may not choose the way of greater interference. If it acts at all, it must choose less drastic means. Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).
It is also important for us to consider the legislative statute governing dissolution of marriage in resolving the question of what constitutes the practice of law in this area. Florida's "no fault" dissolution of marriage statute clearly has the remedial purpose of simplifying the dissolution of marriage whenever possible. Section 61.001, Florida Statutes (1975) states:
(1) This chapter shall be liberally construed and applied to promote its purposes.
(2) Its purposes are:

*1193 (a) To preserve the integrity of marriage and to safeguard meaningful family relationships;
(b) To promote the amicable settlement of disputes that have arisen between parties to a marriage;
(c) To mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage.
Families usually undergo tremendous financial hardship when they decide to dissolve their marital relationships. The Legislature simplified procedures so that parties would not need to bear the additional burden of expensive legal fees where they have agreed to the settlement of their property and the custody of their children. This Court should not place unreasonable burdens upon the obtaining of such divorces, especially where both parties consent to the dissolution.
Present dissolution procedures in uncontested situations involve a very simplified method of asserting certain facts required by statute, notice to the other parties affected, and a simple hearing where the trial court may hear proof and make inquiries as to the facts asserted in those pleadings.
The legal forms necessary to obtain such an uncontested dissolution of marriage are susceptible of standardization. This Court has allowed the sale of legal forms on this and other subjects, provided that they do not carry with them what purports to be instructions on how to fill out such forms or how they are to be used. The Florida Bar v. American Legal and Business Forms, Inc., supra; The Florida Bar v. Stupica, supra. These decisions should be reevaluated in light of those recent decisions in other states which have held that the sale of forms necessary to obtain a divorce, together with any related textual instructions directed towards the general public, does not constitute the practice of law. The reasons for allowing the sale of such legal publications which contain sample forms to be used by individuals who wish to represent themselves are persuasive. State Bar of Michigan v. Cramer, supra, reasoned that such instructional material should be no more objectionable than any other publication placed into the stream of commerce which purports to offer general advice on common problems and does not purport to give a person advice on a specific problem particular to a designated or readily identified person. In Bates v. State Bar of Arizona, 433 U.S. 350, 364, 97 S.Ct. 2691, 2699, 53 L.Ed.2d 810 (1977) the Supreme Court discussed at length the substantial interests in the free flow of commercial speech. The Court said that the choice between the dangers of suppressing information and the dangers arising from its free flow is precisely the choice "that the First Amendment makes for us." There the Court, in approving legal advertising, reasoned that the state cannot assume a paternalistic approach which rests in large part on its citizens being kept in ignorance. The Court stated that we must assume that this information is not in itself harmful, and "that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them."
Although there is a danger that some published material might give false or misleading information, that is not a sufficient reason to justify its total ban. We must assume that our citizens will generally use such publications for what they are worth in the preparation of their cases, and further assume that most persons will not rely on these materials in the same way they would rely on the advice of an attorney or other persons holding themselves out as having expertise in the area. The tendency of persons seeking legal assistance to place their trust in the individual purporting to have expertise in the area necessitates this Court's regulation of such attorney-client relationships, so as to require that persons giving such advice have at least a minimal amount of legal training and experience. Although Marilyn Brumbaugh never held herself out as an attorney, it is clear that her clients placed some reliance upon her to properly prepare the *1194 necessary legal forms for their dissolution proceedings. To this extent we believe that Ms. Brumbaugh overstepped proper bounds and engaged in the unauthorized practice of law. We hold that Ms. Brumbaugh, and others in similar situations, may sell printed material purporting to explain legal practice and procedure to the public in general and she may sell sample legal forms. To this extent we limit our prior holdings in Stupica and American Legal and Business Forms, Inc. Further, we hold that it is not improper for Marilyn Brumbaugh to engage in a secretarial service, typing such forms for her clients, provided that she only copy the information given to her in writing by her clients. In addition, Ms. Brumbaugh may advertise her business activities of providing secretarial and notary services and selling legal forms and general printed information. However, Marilyn Brumbaugh must not, in conjunction with her business, engage in advising clients as to the various remedies available to them, or otherwise assist them in preparing those forms necessary for a dissolution proceeding. More specifically, Marilyn Brumbaugh may not make inquiries nor answer questions from her clients as to the particular forms which might be necessary, how best to fill out such forms, where to properly file such forms, and how to present necessary evidence at the court hearings. Our specific holding with regard to the dissolution of marriage also applies to other unauthorized legal assistance such as the preparation of wills or real estate transaction documents. While Marilyn Brumbaugh may legally sell forms in these areas, and type up instruments which have been completed by clients, she must not engage in personal legal assistance in conjunction with her business activities, including the correction of errors and omissions.
Accordingly, having defined the limits within which Ms. Brumbaugh and those engaged in similar activities may conduct their business without engaging in the unauthorized practice of law, the rule to show cause is dissolved.
It is so ordered.
OVERTON, C.J., and ADKINS, BOYD and HATCHETT, JJ., concur.
KARL, J., concurs specially with an opinion, with which OVERTON, C.J., ADKINS and BOYD, JJ., concur.
KARL, Justice, concurring specially.
There is a popular notion that every attempt to define the practice of law and restrict the activities within the definition to those who are authorized to practice law is nothing more than a method of providing economic protection for lawyers. I recognize that a small number of attorneys who advocate a broad definition of the practice coupled with severe penalties for those who encroach are motivated by economic self-interest. Indeed, regardless of motive, any law or rule that stakes out an area "for lawyers only" will result in some incidental benefit to those who are authorized to practice law  a form of serendipity for them.
What is often lost in the rush to condemn members of the legal profession for alleged selfishness is the existence of a genuine need to protect the public from those who are willing to give legal advice and render legal service, for their own profit, without being competent to do so and without being subject to restraint and punishment if they cause damage to some unsuspecting and uninformed persons in the process. Just as the public must be protected from physical harm inflicted by those who would prescribe drugs and perform surgery without proper training, so must we provide protection from financial and other damage inflicted by pseudo-lawyers.
We could develop a perfect set of disciplinary rules for attorneys and establish a procedure that quickly disbars and delicenses those who violate the rules, but if we should then permit nonmembers of the bar, including those who have been disbarred, to engage in the same activities as lawyers, we would have accomplished nothing. The members of the public would still be in serious jeopardy.
The problem, so well articulated in the majority opinion, is where to draw the lines *1195 between activities that constitute the practice of law and those that do not. There must be a balancing of constitutional rights with the recognized need to protect the public. The broader the definition, the more effective are the disciplinary rules and the greater is the public protection, but the need for protection must give way to rights guaranteed by the Constitution.
I concur with the majority because I am persuaded that the definition of the practice of law developed in The Florida Bar v. American Legal and Business Forms, Inc., 274 So.2d 225 (Fla. 1973), and The Florida Bar v. Stupica, 300 So.2d 683 (Fla. 1974), is too broad to withstand an attack based on the provisions of the First Amendment of the United States Constitution and must, therefore, be contracted. I reject as specious the argument that constitutionally permissible restrictions on activities defined as the practice of law are designed solely to produce high legal fees by discouraging competition and encouraging legal featherbedding.[1]
OVERTON, C.J., and ADKINS and BOYD, JJ., concur.
NOTES
[1] Speaking for the Court in State ex rel. The Florida Bar v. Sperry, 140 So.2d 587, 595 (Fla. 1962), Mr. Justice O'Connell said:

"If the truth be known the unauthorized practice of law by those not qualified and admitted actually creates work for the legal profession because of the errors and mistakes of those who for other illegally perform legal work they are not competent to perform. In this the members of the legal profession gain, but the unfortunate members of the public who were ill-advised lose, in some instances quite badly."