194 N.J. Super. 532 (1984)
477 A.2d 415
NEW JERSEY STATE BAR ASSOCIATION, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
DIVORCE CENTER OF ATLANTIC COUNTY, RICHARD KRAMER AND MARSHA KRAMER, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Atlantic County.
Decided January 20, 1984.
*534 Michael Nolan for plaintiff (Pitney, Hardin, Kipp & Szuch, attorneys).
Richard Kramer, pro se.
GIBSON, J.S.C.
This action by the New Jersey State Bar Association seeks to prevent defendants from engaging in what is alleged to constitute the unauthorized practice of law. Defendants, who are not licensed to practice law, operate as the Divorce Center of Atlantic County and are currently engaged in the business of selling so-called legal kits to members of the public. The case was tried without a jury and the following represents the findings of fact and conclusions of law.

*535 FINDINGS OF FACT
As indicated, defendants are engaged in the business of selling legal kits to members of the public. They describe those kits as permitting laymen to resolve legal problems and affect legal transactions without the use of an attorney. Although the kits include other legal remedies such as bankruptcy, the proofs here were confined to the subject of divorce. In addition to the sales activity by representatives of the Divorce Center, the kits are promoted through advertisements in newspapers and in the "Yellow Pages." The Yellow Pages list the Divorce Center under the category of "Divorce Supplies" as well as part of the listing for "Lawyers."
Transactions conducted by the Divorce Center typically begin with an inquiry by an individual seeking to obtain a divorce or bankruptcy. If the inquiry is by telephone the individual is invited to come into the Divorce Center, at which point he or she is supplied with a written questionnaire to complete. The questionnaire contains basic information, including the customer's name and address, the name and address of the spouse, marriage information, alternative forms of relief, various grounds for divorce, methods of service, whether or not the person is desirous of a "divorce kit" or a "bankruptcy kit" and, finally, whether defendant's "typing service" is to be used. The form contains a disclaimer by defendants to the effect that they are not attorneys and that they are not permitted to give legal advice. The customers are required to certify that they are representing themselves in the action and that matters such as child custody, support, alimony, etc. are to be decided by them. Prior to defendants' use of this questionnaire (adopted following the initiation of this action), the same type of information was obtained by means of an interview, following which the data gathered was transposed onto the written form by a representative of the Center. The cost of the kit is $99. Typically, however, the customer will also choose the proffered "typing service," which costs an additional $85 (raised to $125 during the course of this litigation).
*536 Following a completion of the written questionnaire and the payment of a deposit, and assuming that the customer chooses to obtain the "typing service," a representative of the Divorce Center completes a set of materials including a complaint for divorce, a summons, a letter to the Clerk of the Court and, depending on the type of legal service selected, a letter to the Sheriff and an instruction sheet. The instruction sheet describes the procedure to be followed in obtaining a docket number and completing the service of process. The procedure is broken down into three separate steps and the kit contains individual instructions for each. The final step includes a certification and request to enter default, a requested approval for trial, a proposed final judgment of divorce, instructions regarding the hearing process and examples of the type of testimony the individual will be expected to present.
The practice followed by the Divorce Center, however, goes beyond the selling of legal forms. The exchange between the representative of the Divorce Center and the customer includes the giving of advice and the interpretation of raw data for purposes of completing the various pleadings. The process, which as indicated is completed in separate steps, includes numerous exchanges of this type. The use of the advertising scheme, when combined with the manner in which the information is gathered and interpreted both verbally and in writing, creates an impression to the customers that the services rendered by defendants include expertise, guidance and advice in the area of divorce. The so-called "typing" service, for example, appears to be a veiled way of providing claimed expertise and guidance which go well beyond the mere typing of a form. Although no evidence was submitted regarding a reasonable charge for the typing of documents such as this, this court can take judicial notice that the $125 cost for what would otherwise be filling in a limited number of blanks is inflated. The proofs also included evidence of encouragement from representatives of the Divorce Center to have customers falsify information as part of the divorce complaint. It is unclear, however, as to *537 whether such incidents represent aberrations or a pattern of conduct. Given plaintiff's burden, the attempted showing regarding a pattern was inadequate.
No specific estimates or figures were supplied as part of the proofs, but it would appear from the evidence as a whole that a significant number of persons take advantage of this particular method of obtaining a divorce. It is also a fair inference that, although many people use these kits "successfully," a large number of them run into difficulty, both procedurally and substantively. Examples of the difficulties encountered include defects in the complaint, utilization of the wrong venue, failure to meet residency requirements, improper name changes and problems regarding the subjects of equitable distribution and support. It is clear, therefore, that, not only are defendants giving legal advice, they frequently give bad advice.
The factual findings would not be complete without some mention of the existence of what appears to be a genuine and, to a significant degree, unfulfilled need for low-cost divorces by a substantial segment of the community. Although specific proofs on this issue were not supplied, judicial notice can be taken of the fact that the only realistic alternative for such people is through Legal Services, which admittedly cannot satisfy the existing need without substantial delay.[1] To those people without funds to retain private counsel and not otherwise eligible for legal aid, a judicial termination of what is realistically a dead marriage may be out of reach. Evid.R. 9.
The procedural history of this case began in June of 1981 with the receipt of complaints regarding the Divorce Center by the Supreme Court Committee on the Unauthorized Practice of Law. After initial contacts by the committee with representatives of the Divorce Center, an agreement was entered into *538 between the parties which sought to curtail the activity thought to constitute the unauthorized practice of law. Following the execution of that agreement in January of 1982, the committee closed its file. As a result of continuing complaints regarding defendants' activities and apparent breaches of the agreement, however, the committee thereafter reopened its file and sought a new agreement with defendants which would have precluded any sales of the divorce kit except by mail. Defendants refused to agree to that limitation and this action was instituted. See R. 1:22-7(a); R. 1:22-8.

LEGAL CONCLUSIONS
The primary question to be determined is whether defendants' activities constitute the unauthorized practice of law. If so, it is clear that such conduct is prohibited. Tumulty v. Rosenblum, 134 N.J.L. 514 (Sup.Ct. 1946). As stated by our Supreme Court, the public has the "right to protection against unlearned and unskilled advice in matters relating to the science of the law." Id. at 518. On the other hand, what constitutes the practice of law does not always lend itself to a precise description. That issue has been the subject of dispute not only in this State but elsewhere. See, e.g., N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds., 93 N.J. 470 (1983); State v. Bander, 56 N.J. 196 (1970); N.J. Bar Ass'n v. Northern N.J. Mtge. Associates, 32 N.J. 430 (1960); N.Y. Cty. Lawyers' Ass'n v. Dacey, 28 A.D.2d 161, 283 N.Y.S.2d 984, rev'd 21 N.Y.2d 694, 287 N.Y.S.2d 422, 234 N.E.2d 459 (1967).
There is no question, however, that the sale of do-it-yourself legal kits, even with related textual instructions, is permitted in this State. Supreme Court Committee on the Unauthorized Practice of Law, Opinion 20, 100 N.J.L.J. 893 (Oct. 6, 1977). New Jersey follows what has been labeled the "liberal view" on this question and joins a number of other jurisdictions, including New York, Oregon and Michigan. See, generally, Annotation, "Sale of Forms as Practice of Law," 71 *539 A.L.R.3d 1000 (1976); see also federal cases which treat the constitutional protection afforded to "commercial speech": Virginia Pharmacy Bd. v. Virginia Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); Opinion 20, supra, at 893. Although the Supreme Court Committee held that the sale and advertisement of do-it-yourself legal kits does not constitute the practice of law, it found a significant distinction between such conduct and activity which included personal contact between the distributor of the kit and its customers in the nature of:
... consultation, explanation, recommendation or advice or other assistance in selecting particular forms, in filling out any part of the forms or suggesting or advising how the form should be used in solving the particular customer's marital problems. [Id. at 899; Oregon State Bar v. Gilcrist, 272 Or. 552, 538 P.2d 913 (1975).]
This type of contact was deemed to constitute the unauthorized practice of law and was prohibited.
The above distinction is compelling and is applicable here. When the purveyor of a legal kit goes beyond the mere sale of printed material and begins to engage in activity which includes explaining or recommending particular forms and making judgments as to how a particular individual should fill them out, that person is engaging in conduct which falls within the traditional definition of the practice of law. Ibid.; N.J. Bar Ass'n v. Northern N.J. Mtge. Associates, supra, 32 N.J. at 444-445. It is clear from the evidence in this case that defendants have entered into that restricted area. This is not a situation where there is a mere selling of kits or even a sale together with a typing service as such. Defendants' entire course of dealing shows that the relationship between the seller and the customer involves guidance and advice from the defendant and the reliance on that advice by the customer.
A combination of factors produce this effect. Those factors include the labeling of defendants' business as a "Divorce Center," the advertising of the Center under the telephone *540 directory listing for "Lawyers," the successive visits that are required to complete the process and the manner in which the questioning has occurred as part of the "typing service." This service, as already noted, is clearly more than simply typing. It includes some degree of counseling regarding the filling out of the form and a selection process on the part of defendants that includes the exercise of legal judgments. The use of the questionnaire itself and the transposition of the information it contains onto a pleading involves the exercise of legal judgments because of the choices made in including and excluding certain information.
Although, as mentioned earlier, the line between activities which constitute permissible business conduct by non-lawyers on the one hand and the unauthorized practice of law on the other is often indistinct, N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds.; N.J. Bar Ass'n v. Northern N.J. Mtge. Associates, both supra, in this case defendants' conduct clearly and substantially crosses that line. Not only does that conduct include consultation, advice and assistance such as that proscribed in Opinion 20, supra, it also violates the restrictions imposed by other jurisdictions which follow the so-called "liberal view." N.Y. Cty. Lawyers' Ass'n. v. Dacey, supra; Grievance Committee of Fairfield County Bar v. Dacey, 154 Conn. 129, 222 A.2d 339 (Sup.Ct. 1966), app. dism., 386 U.S. 683, 87 S.Ct. 1325, 18 L.Ed.2d 404 (1967); Oregon State Bar v. Gilcrist, supra.
The line-crossing proscribed by these courts and the dangers the prohibited activity creates were highlighted by the Supreme Court of Michigan in the case of State Bar v. Cramer, 399 Mich. 116, 249 N.W.2d 1 (1976). The court made the following observation regarding the activities of the defendant before it which is equally applicable to the circumstances here:
Because defendant offers counsel in the form of professional guidance to persons seeking to extricate themselves from a legal relationship, the party represented, as well as the public in general, has a right to be assured that these interests are properly represented by members of the bar. To the extent *541 that defendant provides personal advice peculiar to the dissolution of a specific marriage she is engaged in the unauthorized practice of law. [Id., 249 N.W.2d at 9.]
Similarly pertinent is the comment by the Florida Supreme Court in The Florida Bar v. Brumbaugh, 355 So.2d 1186 (Fla. 1978):
Although ... defendant never held herself out as an attorney, it is clear that her clients placed some reliance upon her to properly prepare the necessary legal forms for their dissolution proceedings. To this extent we believe that ... she overstepped proper bounds and engaged in the unauthorized practice of law. [Id. at 1193-1194.]
As is implicit in the rulings, what is at stake and what is sought to be protected by the implementation of the principles outlined above is not the private interest of lawyers but rather the rights of the public to be protected from inadequate and harmful information.
Nor is the harm to which these restrictions are directed merely theoretical. As the evidence in this case substantiates, the dangers are real and the impact can be substantial. The consequences include not only unnecessary delay and expense but frequent jeopardy to substantial property and personal rights. That is not to say that members of the public are immune from jeopardy even when represented by counsel. In contrast to the personnel involved in defendants' operation, however, members of the bar are thoroughly trained and are regulated both with respect to their qualifications and with respect to the conduct of their practice. In those instances when errors are made, clients are at least protected through devices such as malpractice insurance and the New Jersey Clients Security Fund.
Despite the clear direction taken by the courts in proscribing the type of conduct found to exist here, and despite the holding by the Supreme Court Committee on the Unauthorized Practice of Law, defendants nevertheless argue that these guidelines should no longer be relied upon because of the recent decision in N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds., supra. In that case the New Jersey State Bar Association brought suit *542 against licensed realtors as a class and sought a ruling that the preparation by them of contracts for the sale or lease of real estate constituted the unauthorized practice of law. The result was a court-approved settlement which allowed realtors to prepare certain limited contracts. The contracts allowed were ones in which the realtor had a commission or fee interest and where the document contained a clause making it subject to the review of an attorney for the buyer and/or seller within three business days. Id., 93 N.J. at 472. Contrary to defendants' position, however, the ruling in that case does not justify a conclusion that the traditional prohibitions in this area no longer apply.
The distinctions between what was allowed under that settlement and what defendants seek to do here are multiple. The process approved in the Realtor Boards case was severely restricted and includes careful controls. As noted, for example, the approval applies only to licensed realtors, limited types of contracts for the sale and lease of real estate and only where such contracts are an incidental activity of an otherwise lawful business. In addition, the contracts may be completed only where practical necessity dictates an expeditious handling of such agreements and where precautions are taken to assure an appropriate opportunity for review by an attorney. None of these protections is present as part of the conduct sought to be restrained here.
Unlike real estate agents and brokers, who are licensed and regulated pursuant to state statute, N.J.S.A. 45:15-1 et seq., defendants are neither licensed nor regulated; nor are defendants or any of their employees trained or educated in a way which qualifies them to adequately protect the rights of the public in this area. Defendants' conduct is also distinguishable based on the nature of divorce proceedings. There is nothing about a divorce action, for example, which makes prompt consultation with an attorney impractical. Nor is the action which defendants seek to protect incidental to some separate primary and lawful business activity in which they are engaged. The *543 selling of these kits and the conduct that surrounds those sales are defendants' primary activities. The final and perhaps most significant distinction lies in the tentative nature of the realtor contracts and the condition that they provide the opportunity for approval of an attorney within the time limits set.
Whether one examines these differences separately or in combination, it is clear that defendants' conduct meets none of the conditions imposed in the Realtor Boards case. Contrary to defendants' assertion, there is nothing in that opinion which would trigger an indication that the Court intended to move away from the well-established standards dealing with the unauthorized practice of law. Thus, there is no reason for this court to conclude that the public is to be any less protected from improper and unauthorized advice in connection with the sale of legal kits than would reasonably be deemed to be necessary based on the authorities previously cited.
Having now concluded that defendants' conduct constitutes the unauthorized practice of law but that the sale of the divorce kits themselves is not unlawful, the question remains as to how to reconcile those two conclusions in a manner which will effectively serve the public interest. Plaintiff suggests that the appropriate remedy is to enjoin all personal contact between defendants and their customers and to permit the sale of the kits only through the mail. It is argued that it is only through this prophylactic approach that the abuses found to exist can be precluded. In accordance with the directives in Opinion 20, supra, personal contact between the distributor and the purchaser is prohibited when it takes the form of "consultation, explanation, recommendation or advice or other assistance in selecting particular forms, and filling out any part of the forms or suggesting how the forms should be used in solving a particular customer's marital problems." Id. at 899. That directive, however, does not proscribe all personal contact between the distributor of the kit and the customer. Theoretically, at least, defendants should be permitted to continue to sell and advertise these kits and even to provide a typing *544 service, so long as those activities do not include consultation, explanation or advice etc. Opinion 20, supra. In fact, it was precisely this type of restriction which was imposed by this court as part of the preliminary restraints issued when the matter was before the court on the return day of the order to show cause.
Plaintiff nevertheless argues that the record of defendants' conduct, even after the entry of the above restraint, proves that the Divorce Center has provided and will continue to provide unauthorized consultation and advice, and that the only way to adequately protect the public is to require sales through the mail. Defendants, on the other hand, take the position that the order has not been violated and that neither the Divorce Center nor the public should be deprived of the ability to engage in the activity involved here. As defendants point out, all of their customers are advised that the Divorce Center is not engaged in the practice of law and is not authorized to give legal advice. Defendants also suggest that to restrict the operation in the manner plaintiff suggests would effectively shut down the business and, aside from a severe financial impact that such a result would have on them, the public would be deprived of a much needed service.
No proofs were presented to support the conclusion that a restriction on the sale of divorce kits to sales by mail would shut down the operation or have any negative impact on the public. On the other hand, given the clear authority supporting the sale of the kits, one may reasonably ask what basis exists for restraining the commercial speech which might be considered natural to those sales. See United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); Milkwagon Drivers Union v. Meadowmore Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941); cf. Supermarkets General Corp. v. Consumer Value Stores, 191 N.J. Super. 7 (App.Div. 1983). Although there do not appear to be any New Jersey cases directly on point, federal authorities support the conclusion *545 that in the face of unlawful activity the remedy may have to go beyond the restraint of that conduct alone. As pointed out in United States v. Loew's, Inc., 371 U.S. at 53, 83 S.Ct. at 106, for example, "[T]o insure ... that relief is effectual, otherwise permissible practices connected with the activity found to be illegal must sometimes be enjoined." Even under New Jersey law, general equitable principles give this court the power to fashion a remedy in a manner best designed to fit the facts of the particular case and broad enough to achieve the required objective. As frequently pointed out, equity will not suffer a wrong without a remedy. Roberts v. Roberts, 106 N.J. Super. 108-109 (Ch.Div. 1969). The real question, therefore, is not the power of the court to do what is being asked, but whether the remedy sought is appropriate. In that regard, it must be remembered that the extent of the restraint requested is quite severe in that it effectively precludes anything other than written communications between the customer and defendants. First Amendment protections are clearly implicated. See Virginia Pharmacy Bd. v. Virginia Consumer Council, supra. At the very least, the dimension of the freedoms at stake warrants the exercise of caution in approaching such a request.
Constitutional freedoms aside, the request to limit defendants' activities to sale by mail alone presumes that a workable alternative is not realistically available. Despite the abuses found to exist, the weight of the evidence does not compel such a conclusion. This court is not satisfied, for example, that defendants will not comply with a well-structured and easily followed permanent restraint. Even if such an assumption proves to be unwarranted, the inclusion in the restraint of a review provision would allow the matter to be brought back before the court, at which time, if warranted, a more radical approach could be considered.
For the present, therefore, the more equitable approach appears to lie within a framework in which the divorce kits can continue to be sold and made available but with protection *546 designed to insulate the public from improper, incorrect and otherwise unauthorized advice. That framework should include an adequate disclaimer not only as to the fact that the seller is not an attorney and does not render legal advice, but also as to the limited benefit of the kit itself. For example, the purchaser should be alerted that the kit does not purport to deal adequately with considerations such as custody or equitable distribution. In addition, as compelled by Opinion 20, the process by which the sales are completed must preclude personal contact in the nature of consultation, explanation, recommendation or advice, or other assistance in selecting particular forms, and filling out any part of the forms or suggesting or advising how the form should be used in solving the particular customer's marital problems. Verbal exchanges will necessarily be limited to a description of the kits available, prices and payment plans, and directions to the customer that the kits contain their own instructions and are therefore self-explanatory. Defendants will not be precluded from offering a typing service as such, but will be precluded from conducting it in the manner previously employed. The use of questionnaires, for example, will be prohibited; so will the interview process by which this information was previously obtained. The forms must be self-explanatory. If a customer wishes to have them typed, the forms must be completed by the customer without any assistance (other than that contained in the written instructions) and then returned to the defendants for typing. Any rendering of advice or answering questions regarding the manner in which the form is to be filled out will be prohibited, and customers must be put on notice as to that limitation before they commit themselves to the purchase of the kit.
As part of the relief granted, defendants will be required to submit a plan for revising the existing kit and its instructions. Plaintiff will be given an opportunity to be heard regarding the sufficiency of the revisions prior to the entry of a final order. This court will also retain jurisdiction for a period of six months *547 thereafter, during which time plaintiff may monitor defendants' sales in order to ensure compliance.
With the above controls, divorce kits can continue to be available to the public at relatively low cost for utilization in those circumstances which make such use desirable. At the same time, the public will be reasonably protected from improper and incorrect advice, and the conduct complained of here will be precluded. It may be, of course, that even these protections will not insure good-faith compliance. No device is foolproof. On the other hand, given all of the considerations present, including the public interest, this procedure should be attempted. Plaintiff should submit an order consistent with the above.
NOTES
[1] Although suggestions were made that a limited number of private attorneys also handle low-cost divorces, the general observation made by this court regarding an unfulfilled need appears to be a fair one.