WARNER, Judge.
This appeal challenges the holding of the trial court that Florida Statutes prohibiting uninvited in-person direct solicitation of clients by certified public accountants and prohibiting competitive bidding by CPAs are unconstitutional as violative of the First Amendment. For the reasons hereinafter expressed, we reverse as to the solicitation and affirm as to the competitive bidding regulations.
I. Solicitation
(a) Facts
Section 473.323(1)(Z), Florida Statutes (1989) provides that disciplinary action against certified public accountants may be taken for:
Engaging in direct, in person, uninvited solicitation of a specific potential client, except to the extent that such solicitation constitutes the exercise of constitutionally protected speech as determined by the rules of the board [of Accountancy].
Pursuant to that statute, the Board promulgated Fla.Admin.Code R. 21A-24.002 (1981) regarding solicitation which in subsection (2)(c) states:
A licensee [CPA] shall not by any direct, in-person, uninvited solicitation solicit an engagement to perform public accounting services: ... (c) where the engagement would be for a person or entity not already a client of the licensee, unless such person or entity has invited such a communication.
Fla.Admin.Code R. 21A-24.002(3) provides:
For purposes of this rule, the term “direct, in-person, uninvited solicitation” shall be deemed and construed to mean any communication which directly or implicitly requests an immediate oral response from the recipient. Uninvited in-person visits or conversations or telephone calls to a specific potential client are prohibited.
Appellee was charged with violating this provision when he called two businesses to offer them his services after he was informed that their former CPA had retired. A complaint by a competing CPA firm was filed with the State Board of Accountancy against appellee. Appellee challenged the constitutionality of the solicitation provisions of the statute by filing a declaratory judgment action in the lower court on the grounds that the provisions were unconstitutional as violative of the First Amendment. The trial court heard the case on stipulated evidence and depositions and determined that both provisions were viola-tive of the First Amendment guarantee of free speech.
(b) Supreme Court Case Law
We deal here with commercial speech, that is, speech proposing a commercial transaction. That such speech is protected by the First Amendment is a notion of relatively recent origin. While earlier cases may have hinted at First Amendment status for commercial speech, in Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Court squarely held that commercial speech can obtain First Amendment protection even though it merely proposes a commercial transaction. The Court reasoned that generally the free flow of commercial information was essential to a free enterprise system. In Virginia State Board, the Consumer Council challenged regulations precluding pharmacists from advertising their prices for prescription drugs. The Court found a consumer and societal interest in the free flow of commercial information regarding economic matters. The State on the other hand argued that a justification for an advertising ban was the State’s strong interest in maintaining professional *1354 ism among its pharmacists. However, noting that the advertising ban does not directly affect professionalism, the Court dismissed such arguments.
That case was followed the next term by Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), in which two members of the Arizona Bar challenged that Bar’s ban on advertising, specifically the advertising of the cost of routine legal services. The Court extended the commercial speech protection established in Virginia State Board to regulations regarding print advertising by lawyers. Again, the Court noted the substantial individual and societal interest in receiving information of the availability, nature, and prices of products and services so as to allow the functioning of the free enterprise system in the allocation of economic resources. The Court then analyzed the justifications of the State for preventing advertising of the price of legal services and found them insufficient. The Court found that print advertising did not negatively affect professionalism, was not inherently misleading, and that restraints on advertising did not deter low quality work, the primary justifications set forth by the Bar.
In short, the Court found that none of the State’s justifications for restriction of this type of commercial speech withstood the premise of Virginia State Board that the First Amendment protects the free flow of commercial speech as essential to the free enterprise system, particularly with respect to information regarding price of service. However, it cautioned, as it had in Virginia State Board, that there may be reasonable restrictions on time, place, and manner of advertising which may withstand constitutional scrutiny. Bates, 97 S.Ct. at 2709; Virginia State Board, 96 S.Ct. at 1830.
The opportunity to restrict commercial speech as to time, place, and manner of presentation came the next term when the Court decided Ohralik v. Ohio State Bar Association, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), a case strongly relied on by appellant herein. The Ohio State Bar association had brought disciplinary proceedings against Ohralik for his personal solicitation of automobile accident victims for the purpose of securing his representation. of them on a contingent fee basis. The question presented to the Court was whether the State’s prohibition of in-person solicitation of clients by attorneys or their agents violated the First Amendment, i.e.) whether the Bates rationale would be extended to personal solicitation prohibitions.
In analyzing solicitation consistent with its protection of commercial speech for its informational value to a free enterprise system, the Court first addressed how in-person solicitation was different than the public advertising addressed in Bates. It noted that:
in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection_ In-person solicitation is as likely as not to discourage persons needing counsel from engaging in a critical comparison of ‘availability, nature, and prices’ of legal services, cf. Bates, 433 U.S., at 364, 97 S.Ct., at 2699, it actually may disserve the individual and societal interest, identified in Bates, in facilitating ‘informed and reliable decision making.’
Id., 98 S.Ct. at 1919. Thus, in-person solicitation did not necessarily fulfill the function for which the protection of commercial speech by the First Amendment was originally extended in Virginia State Board and later in Bates.
Next the Court looked at the state interest in prohibiting in-person solicitation. The Court found, and the appellant conceded, that the State had a legitimate interest in “preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of ‘vexatious conduct’.... We agree that protection of the public from these aspects of solicitation is a legitimate and important State interest.” Id., 98 S.Ct. at 1921. The Court then held that the State’s ban on all in-person solicitation was a reasonable
prophylactic measure[s] whose objective is the prevention of harm before it oc *1355 curs. The Rules were applied in this case to discipline a lawyer for soliciting employment for pecuniary gain under circumstance likely to result in the adverse consequences the State seeks to avert. In such a situation, which is inherently conducive to overreaching and other forms of misconduct, the State has a strong interest in adopting and enforcing rules of conduct designed to protect the public from harmful solicitation by lawyers whom it has licensed.
Id. at 1923 (emphasis added).
The Court accepted the State’s “perception” of the danger of in-person solicitation, noting a Federal Trade Commission study of the detrimental aspects of door-to-door selling of ordinary consumer products. Further, “it hardly need be said that the potential for overreaching is significantly greater when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured or distressed lay person.” Id. at 1923.
In upholding the regulations the Court rejected the appellant’s view that there must be harm in fact proved in order to justify disciplinary proceedings. The Court stated:
The efficacy of the State’s effort to prevent such harm to prospective clients would be substantially diminished if, having proved a solicitation in circumstances like those of this case, the State were required in addition to prove actual injury. Unlike the advertising in Bates, in-person solicitation is not visible or otherwise open to public scrutiny_ If appellant’s view were sustained, in-person solicitation would be virtually immune to effective oversight and regulation by the State or by the legal profession.... It therefore is not unreasonable, or viola-tive of the constitution, for a State to respond with what in effect is a prophylactic rule.
Id., 98 S.Ct. at 1924 (emphasis supplied). By approving the “prophylactic rule” which banned all personal solicitation, such a ban necessarily included solicitation which was neither overreaching, fraudulent or vexatious.
Next came Central Hudson Gas & Elec. Corp. v. Public Service Comm’n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The Court therein summarized the First Amendment protection that it had accorded to commercial speech as follows:
The First Amendment’s concern for commercial speech is based on the informational function of advertising. [Citation omitted]. Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it. Friedman v. Rogers, [440 U.S. 1, 99 S.Ct. 887 (1979) ] at 13, 15-16, 99 S.Ct. at 896, 897; Ohralik v. Ohio State Bar Assn., [citation omitted] or commercial speech related to illegal activity [citation omitted].
100 S.Ct. at 2350 (emphasis supplied). The Court then adopted a four-part test to measure the restrictions on commercial speech.
In commercial speech cases, then, a four part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted government interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
Id. 447 U.S. at 566, 100 S.Ct. at 2351. Thus, whether or not an analysis of the last two elements of the test is necessary depends upon a finding that the speech in question concerns lawful activity and is not misleading. However, in assessing whether or not the speech is “misleading,” the Court appears to have allowed the States to determine whether or not in-person solicitation as a mode of communication is “inherently misleading”. In In re R.M.J., 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 *1356 (1982), a case involving State Bar rules prohibiting advertising of specialties, the Court stated:
Thus the Court has made clear in Bates and subsequent cases that regulation and imposition of discipline are permissible where the particular advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive. In Ohralik v. Ohio State Bar Assn. [citation omitted] the Court held that the possibility of ‘fraud, undue influence, intimidation, overreaching and other forms of “vexatious conduct” ’ was so likely in the context of in-person solicitation, that such solicitation could be prohibited. ...
Commercial speech doctrine, in the context of advertising for professional services, may be summarized generally as follows: Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the State may impose appropriate restrictions. Misleading advertising may he prohibited entirely (emphasis supplied).
Id., 102 S.Ct. at 937. In the case of lawyers, the Court has determined that such in-person solicitations are inherently misleading and do not serve the informational function necessary to justify First Amendment protection. Our task is now to analyze the in-person solicitation ban on accountants under the foregoing line of cases.
(c) Florida Cases and Regulations
The State regulates the profession of certified public accountants because:
The Legislature recognizes that there is a public need for independent and objective public accountants and that it is necessary to regulate the practice of public accounting to assure the minimum competence of practitioners and the accuracy of audit statements upon which the public relies and to protect the public from dishonest practitioners and, therefore, deems it necessary in the interest of public welfare to regulate the practice of public accountancy in this state.
§ 473.301, Fla.Stat. (1989). While others may provide tax services or bookkeeping services, certified public accountants alone perform the “attest” function, which refers to the process by which CPA’s audit financial statements and express opinions as to those financial statements. Those audits are relied on not only by the clients on whose financial matters audits are performed but upon a host of other individuals and entities who may rely on the information in making their own economic decisions. Audited statements are relied upon by banks, other creditors, and investors. The government requires the opinion of a CPA in submitting financial information on many matters, including SEC filings and stock offerings, financial condition of banks and other institutions, and condominium association transfers to name only a few. In short, the use of financial statements attested by CPAs is so frequently used in our economic system as to be indispensable. Unlike the attorney/client relationship to which the attorney’s allegiance is to the client, CPAs are required to be independent from their clients when providing the attest services. Because the State and the public rely on the CPAs to perform this vital function in the economy, the State has an important interest in the regulation of the profession and the practice of public accounting in general. Thus, we find that the State has a substantial interest in regulating the profession.
We turn to what we perceive is the dispositive question in the case, and that is whether in-person solicitation of clients by CPAs is “inherently misleading” within the meaning of Ohralik and In re R.M.J. so as to justify the outright prophylactic ban on such conduct. We first note that in-person solicitation is described by the rule as “communication which directly or implicitly requests an immediate oral response from the recipient.” Fla.Admin.Code R. 21A-24.002(3). Thus, it focuses on those types of solicitation which the Ohralik court stat *1357 ed were particularly unsuited to conveying the “free flow of economic information”, the foundation of the Court’s extension of First Amendment protection to commercial speech. See Virginia State Board. Furthermore, there is no prohibition of an accountant from soliciting any person or entity by way of written communication. Thus, the rules do not prohibit the dissemination of information regarding availability of services: it just proscribes the method of the communication.
The State contends that it has a legitimate interest in protecting the public from those forms of solicitation which involve fraud, undue influence, and vexatious conduct. Where solicitation is directed toward total strangers by the CPA, such conduct may be said to be “vexatious” and overreaching and subject to discipline. We gain support in this conclusion from The Florida Bar v. Schreiber, 407 So.2d 595 (Fla.1981), opinion vacated, 420 So.2d 599 (Fla.1982), a case involving direct mail solicitation of specific prospective clients by an attorney. While the opinion was vacated after In re R.M.J. was decided, in discussing the solicitation aspects of the case the Court stated:
The problems with direct mail solicitation are more akin to those of door-to-door canvassing than to those of newspaper advertising. The threat of door-to-door soliciting is the establishment of a relationship by the solicitor which overpowers the will of the recipient. In both mail and personal solicitation there is a possibility that the activity invades the privacy of citizens, see Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951) and thrusts the advertiser’s message upon a captive audience. See Bigelow [v. Virginia,] 421 U.S. [809] at 828, 95 S.Ct. [2222] at 2235 [44 L.Ed.2d 600 (1975)]_ [W]e feel that in circumstances in which the recipient is completely a stranger to the soliciting attorney and particularly if the recipient were emotionally, mentally, or economically vulnerable, that a soliciting letter could be highly intrusive. The people of this state have evinced a deeply protectionistic attitude towards their privacy as Florida is one of a handful of states adopting an independent privacy amendment [footnote quoting Article 1, Section 23, Florida Constitution omitted]. This consideration must be given weight in our balancing of Schreiber’s right to commercial promotion through the mail against the State’s interest in prohibiting his activity.
Schreiber, 407 So.2d at 599. Thus, the State has an interest in preventing “vexatious” conduct which may include uninvited solicitations intruding on the right of privacy of both individuals and businesses in the state. Whether the solicitation is by a lawyer or a CPA, pressure can be exerted on a potential client to make a hasty and uninformed decision. While CPAs may not be trained in the art of persuasion, they are trained in the intricacies of taxes and financial statements which even the most sophisticated lay person finds confusing. We are not so naive as to think that all CPAs would never take advantage of a client if allowed to personally solicit the client, any more than we think that all lawyers are “bad apples” who exploit every prospective client. It is the possibility of harmful solicitation and the knowledge that — whether by the door-to-door salesman, the attorney, or the CPA — all in-person solicitation is particularly susceptible to abuse which allows the State to regulate such conduct.
Since in-person solicitation is a mode of communication least likely to result in the free flow of information protected in Virginia State Board, we find that the State may constitutionally prohibit it. Given the further concern expressed in Ohralik that in-person solicitation is nearly impossible to police, we find that the State’s solution to ban all such contacts constitutes a “reasonable fit” between the regulation and the substantial State interests served. See Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). Cf. Greenberg v. Michigan Optometric Ass’n, Inc., 483 F.Supp. 142 (E.D.Mich.1980) (holding that the state prohibition on personal solicitation by optometrists was not a violation of the First Amendment given the difficulties regulating one on one solicitation). We therefore *1358 reverse the final judgment of the trial court finding section 473.323(1)(Z), Florida Statutes unconstitutional.
II. Competitive Bidding
In his complaint for declaratory judgment, appellee also challenged the constitutionality of section 473.317(1), Florida Statutes which provides as follows:
A licensee [CPA] shall not make a competitive bid for a professional engagement in which the licensee will attest as an expert in accountancy to the reliability or fairness of presentation of financial information or utilize any form of disclaimer of opinion which is intended or conventionally understood to convey an assurance of reliability as to matters not specifically disclaimed.
The statute defines “competitive bid” as the submission of an offer, either orally or in writing, directly or indirectly, to perform a professional engagement “for an estimated fee, a fixed fee, or a basis of fee.” § 473.317(2), Fla.Stat. Subsection (4) provides that a licensee may respond to any request for information, excluding any quotation as to a basis of the fee, which by rule includes even a minimum fee or an hourly rate. § 473.317(2), Fla.Stat.; Fla.Admin.Code R. 21A-24.003.
Section 473.317(5), Florida Statutes, mandates the procedure by which a client may select a CPA firm. The potential client is required to rank the CPA firms in order of preference and then may negotiate a contract with the highest-ranked licensee. If negotiations are unsuccessful, then after “formal termination” the client can then commence negotiations with the next ranked firm. However, after terminating negotiations with a licensee, the prospective client is not permitted to go back and enter into a contract with the prior-ranked CPA firm. Subsection (5)(b) provides an exemption from this procedure for government bodies. Therefore, the effect of the statute is to prohibit price information solely in competitive bids for private audits.
The State justifies the prohibition on providing fee information on the ground that a CPA would be more independent of its client if the CPA were selected on technical ability rather than cost. It presented government studies that showed that the frequency rate of acceptable audits was only 10% when performed by CPAs on sampled government projects when cost was the only consideration in the CPA’s employment. Therefore, a ban on the presentation of cost information to the client was considered necessary in order to protect the quality of audits.
The trial court found that the ban on competitive bidding did not meet the four prong test in Central Hudson and was thus unconstitutional. With this conclusion we agree.
There is no doubt that price information is the very type of speech that Virginia State Bd. of Pharmacy v. Virginia Consumer Council held was protected commercial speech. The free flow of information upon which consumers could make choices in the allocation of economic resources was the very foundation of the commercial speech doctrine. Therefore, the first prong of the Central Hudson test is met. Certainly the speech involved, namely quoting fees for CPA work, is not unlawful. Appellant contends, however, that it in effect is inherently misleading because a CPA may submit a bid without an analysis of the client’s actual needs and requirements, and then the CPA may sacrifice quality to get the audit completed for the price bid. The same basic argument with respect to price advertising was proffered and rejected in Bates:
We are not persuaded that restrained advertising by lawyers inevitably will be misleading.... Although the precise service demanded in each task may vary slightly, and although legal services are not fungible, these facts do not make advertising misleading so long as the attorney does the necessary work at the advertised price.
Bates, 97 S.Ct. at 2703 (emphasis supplied). The same can be said for CPA competitive price quotation. Such information can only be misleading if the CPA does not do what he or she contractually agrees to do for the price bid. Thus, we find that price quotation is not inherently misleading.
*1359 Likewise, the second prong of the Central Hudson test, that the asserted governmental interest be substantial, is also met. As we noted in connection with our discussion of solicitation the state has an interest in maintaining the quality and independence of the attest function performed for clients but relied upon by governmental agencies as well as the public at large. Further, the state has a legitimate interest in regulating skilled professions. See Mercer v. Hemmings, 170 So.2d 33, 39 (Fla.1964).
Having met the first two prongs, Central Hudson requires a determination of whether the regulation directly advances the government interest asserted and whether it is not more extensive than is necessary to serve that interest. The State contends that audit statements prepared where cost is the controlling factor will be substandard and therefore defeat the governmental interest in maintaining the quality of audit information on which the public relies. The State points to the GAO reports introduced below. Some parts of the studies do support the conclusion that choosing a CPA based on cost alone increases the chances of an unacceptable audit. This evidence might be taken to mean that banning any discussion of price would further the state interest in assuring the independence and quality of the audit, although the State Board produced no evidence that the quality of audits in Florida was markedly higher than those performed in other states where competitive bidding and price quotation is allowed. However, the GAO report nowhere states that CPAs should be prohibited from providing information regarding the cost of an audit. In fact the GAO study states:
[Competitive negotiation has therefore been the preferred method of obtaining audit services because it is flexible enough to take price into account but permits the entity to make informed choices given the marketplace. Competitive negotiation allows an entity to trade off features of experience, quality, qualifications, and value and to take advantage of unique talents and proposals that might be offered and tailored precisely to the entity’s needs.
U.S. Gen. Accounting Office, CPA Audit Quality — a Framework for Procuring Audit Services 15 (1987). Rather than supporting the prohibition of price information, the GAO report agrees that it is a factor to be considered.
Furthermore, the Court has also rejected the justification promoted by the State that pricing information may be prohibited to assure that the consumer chooses quality over price. As the Bates Court stated:
Advertising does not provide a complete foundation on which to select an attorney. But it seems peculiar to deny the consumer, on the ground that the information is incomplete, at least some of the relevant information needed to reach an informed decision. The alternative — the prohibition of advertising — serves only to restrict the information that flows to consumers. Moreover, the argument assumes that the public is not sophisticated enough to realize the limitations of advertising, and the public is better kept in ignorance than trusted with correct but incomplete information. We suspect the argument rests on an underestimation of the public. In any event, we view as dubious any justification that is based on the benefits of public ignorance. See Virginia Pharmacy Board v. Virginia Consumer Council [citation omitted]. Although, of course, the bar retains the power to correct omissions that have the effect of presenting an inaccurate picture, the preferred remedy is more disclosure, rather than less. If the naivete of the public will cause advertising by attorneys to be misleading, then it is the bar’s role to assure that the populace is sufficiently informed as to enable it to place advertising in its proper perspective.
Bates, 97 S.Ct. at 2704. See also Florida Bar v. Brumbaugh, 355 So.2d 1186, 1193 (Fla.1978). The same may be said about the exclusion of cost quotations by CPAs. As the appellee noted in his brief, “[t]he regulations at issue do not directly advance the government’s interest since they do not prevent shoddy work [low quality audits]; they only eliminate price competition.” See also Bates, 97 S.Ct. at 2706. Although the *1360 State has a substantial interest in the accuracy of audits which are relied upon by the public, rather than eliminate price competition which has at best only an indirect effect on quality, a far greater incentive to produce a quality audit is the threat of liability of the accountant to the third parties who rely on the audit. See First Florida Bank v. Max Mitchell & Co., 558 So.2d 9 (Fla.1990).
With respect to the fourth prong of the Central Hudson test, that is, whether the regulation is more extensive than necessary, the statute and regulations also fail. While we recognize what is needed is only a reasonable “fit” between the government’s ends and the means chosen to accomplish those ends, see Board of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989), we conclude that this statute and regulation go much farther than necessary and unnecessarily restrict the very type of speech which first found its constitutional protection in Virginia State Board of Pharmacy. As that Court stated with respect to the prohibition of the publication of pricing information by pharmacists:
Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways [citations omitted]. But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering. In this sense, the justification Virginia has offered for suppressing the flow of prescription drug price information, far from persuading us that the flow is not protected by the First Amendment, have reinforced our view that it is.
425 U.S. at 770, 96 S.Ct. at 1829. The prohibition of price competition is not a means narrowly tailored to achieve the desired result of quality audits. See Board of Trustees, 109 S.Ct. at 3035. It cannot stand constitutional muster under the First Amendment.
We therefore affirm the trial court and hold that section 473.317, Florida Statutes and the regulations enacted thereunder are unconstitutional.
Affirmed in part; reversed in part and remanded.
POLEN, J., concur.
STONE, J., concurs in part and dissents in part with opinion.