Serena DUNN, Individually and Willie A. Wiggs and Marva Pamella Evans, Individually and on behalf of a class of similarly situated individuals, Plaintiffs,

v.

**THE FLORIDA BAR, et al., Defendants.**

**Civ. A. No. 83–243–CIV–J–12.**

United States District Court, M.D. Florida, Jacksonville Division.

Aug. 30, 1988.

---

Alan B. Morrison, Washington, D.C., and William B. Sheppard, Sheppard and White, P.A., and Elizabeth L. White, Jacksonville, Fla., for plaintiffs.

Eric J. Taylor, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for Supreme Court of Florida.

C. Harris Dittmar, Bedell, Dittmar, DeVault & Pillans, P.A., Jacksonville, Fla., for defendants The Florida Bar and President Ray Ferrero, Jr.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Alan B. Morrison is principal attorney for the plaintiffs in this declaratory and injunction action, based on 42 U.S.C. § 1983, which he filed on March 16, 1983 against The Florida Bar and The Florida Supreme Court. Subsequent to events described *infra*, parts I.B. and III.A., the case was dismissed with prejudice on August 27, 1987, subject to the following:

Plaintiffs' claim a right to attorneys' fees under the provision of 42 U.S.C. § 1988. Defendants deny that this case involves any rights of the Plaintiffs secured by the United States Constitution and deny that Plaintiffs are prevailing parties. For these and other reasons, Defendants contend that Plaintiffs are not entitled to attorneys fees under 42 U.S.C. § 1988.

As reserved in the Stipulation of Dismissal, Mr. Morrison and other attorneys for the plaintiffs in this class action, on October 26, 1987, submitted their application for $113,606.54 in attorneys' fees and costs in this action, pursuant to 42 U.S.C. § 1988.

The application was briefed. On March 17, 1988 the matter was transferred for hearing and determination of plaintiffs' application for attorneys' fees, from the docket of the Honorable Howell W. Melton to the within judge.[1] On March 17 and 24, 1988, oral hearings were held before this judge, at which argument was heard, testimony received and exhibits admitted. Post-hearing briefs of the parties have been filed, and the case has been submitted.

## I.

### A.

On March 16, 1983 Serena Dunn, individually and on behalf of a class of similarly situated individuals, filed her complaint for declaratory and injunctive relief against The Florida Bar and The Supreme Court of Florida. In part, she stated

Plaintiff class members are unable to afford the services of attorneys to assist them in obtaining relief which only the State can provide and are also unable, by reason of their illiteracy, blindness, their inability to read and write English, or other handicap to handle their matters *pro se* or with the limited assistance currently allowed to be provided by lay persons under Florida law.

On January 5, 1984, the court denied an earlier motion to dismiss of defendant The Florida Bar. At a class certification hearing of July 3, 1984, the depositions of Serena Dunn and Rosemary Furman were filed in open court. The court continued the

---

1. A Senior District Judge in the Northern District of Ohio, Judge William K. Thomas was sitting by designation in the Middle District of Florida, Jacksonville Division.

hearing on plaintiff's motion for class certification to give counsel for the plaintiff the opportunity to provide the name of a proper representative for a class action. Defendants deposed Willie A. Wiggs and Marva Pamella Evans, as proposed class representatives, on September 6, 1984.

At a hearing on November 15, 1984, the court entered an order granting class certification. The court determined that Willie A. Wiggs and Marva Pamella Evans were adequate representatives of the plaintiff class. As further ordered, plaintiffs Serena Dunn, Willie A. Wiggs and Marva Pamella Evans, on November 28, 1984, filed their third amended complaint for declaratory and injunctive relief. In said Third Amended Complaint plaintiffs allege

> [T]he Supreme Court has determined that lay assistants, such as legal secretaries, may do no more than type verbatim court pleadings that are given to them by their customers. They are forbidden from using intake forms to obtain from their customers the information called for in the pleadings, and they may not discuss the papers given them by their customers, even when the papers are incomplete or contain contradictory information. Failure to adhere strictly to these restrictions subjects such lay assistants to injunctive actions, as well as civil and criminal contempt proceedings, brought by the defendants.

Plaintiff Serena Dunn states that she was married to Anthony L. Dunn on February 3, 1982. Shortly thereafter, "he began physically abusing her," and in July 1982 she decided to seek a dissolution of their marriage and protection from the Florida courts. She further states

> On July 7, 1982, plaintiff Dunn went to the offices of Rosemary Furman, a legal secretary, to obtain assistance in preparing the papers needed for the dissolution of her marriage. At that time, Ms. Furman believed that she was permitted to use written intake forms to service her customers, but plaintiff Dunn was unable even to read and comprehend the written instructions for Ms. Furman's in-

take form and provide the necessary information in writing.

The plaintiffs further allege that "Ms. Furman was therefore required to refuse to assist the plaintiff Dunn, and did in fact refuse to assist her, despite the fact that plaintiff Dunn is unable to afford the services of an attorney and there are no lawyers available to serve her on a *pro bono* or reduced fee basis."

Plaintiffs Wiggs and Evans allege that they bring their action on behalf of a class of similarly situated individuals, consisting of all present and future residents of the Fourth Judicial Circuit of Florida

> (a) who either presently desire, or in the future may desire, to exercise their fundamental right to obtain a dissolution of marriage;
>
> (b) who are unable to exercise their right to do so without the assistance of another person because they lack the skills, knowledge, familiarity with the court system, self-confidence, and other abilities required to appear *pro se;*
>
> (c) who are not eligible to utilize the simplified dissolution of marriage procedures in Rule 1.611(c) of the Florida Rules of Civil Procedure which entitle them to the assistance of the Clerk of the Court in obtaining a dissolution of marriage
>
> (d) who are unable to obtain the services of a lawyer because they cannot afford to pay the charges of a lawyer and because no lawyers are available to serve them on a *pro bono* or reduced fee basis; and
>
> (e) who are able to afford the services of persons who, although not members of the Bar, are able to provide them the assistance they need to obtain a dissolution of their marriage and for which they charge members of the plaintiff class an amount which the class members can afford; but who are unable to utilize the services of such lay assistants because of the restrictions against lay assistants providing such services which are enforced by defendants.

Plaintiffs further allege that plaintiff Wiggs went to the office of Ms. Furman on

June 1, 1984 to obtain assistance in preparing the papers needed for the dissolution of his marriage. Papers were prepared for plaintiff Wiggs "but his wife refused to sign them, and hence he returned to Ms. Furman's office for additional assistance." Ms. Furman then "determined that she could not lawfully assist him and refused to provide him the assistance that he needed, despite the fact that plaintiff Wiggs is unable to afford the services of an attorney and there are no lawyers available to serve him on a *pro bono* or reduced fee basis."

As to new party plaintiff Marva Pamella Evans, the Third Amended Complaint states

> On July 10, 1984, plaintiff Evans went to the office of Ms. Furman to obtain assistance in preparing the papers needed for the dissolution of her marriage. At that time, Ms. Furman determined that she could not lawfully assist plaintiff Evans and refused to provide her the assistance that she needed, despite the fact that plaintiff Evans is unable to afford the services of an attorney and there are no lawyers available to serve her on a *pro bono* or reduced fee basis.

In addition to the Third Amended Complaint, the orders of the court and docket entries, the record is deemed to comprise plaintiffs' depositions, Rosemary Furman's deposition, exhibits received at the March 24, 1988 hearing, the briefs of the parties filed at all stages of the case, and any admissions of the parties.

## I.

## B.

The Florida Bar and The Florida Supreme Court filed separate motions for summary judgment on September 27, 1985 and October 2, 1985; and the plaintiffs filed a consolidated response on October 18, 1985. On December 2, 1985 the court conducted an oral hearing. At the hearing the court engaged in extensive colloquy with counsel about the right or wrong of permitting limited conversations between a lay assistant and customer about correcting mistakes in entries filled into blanks in divorce forms.

On November 10, 1986 the court entered its order on the defendants' summary judgment motions. The court denied the motion of each defendant. The court's treatment of the constitutional issue, which it defined in its order, is examined *infra* part II.B.

On February 18, 1987 the court conducted a status conference. Trial was set for October 13, 1987, but the plaintiffs' voluntary dismissal of the case on August 27, 1987 mooted the trial. Thus, the constitutional question which the court had posed in his order of November 10, 1986 was not resolved.

In and after November, 1986, The Florida Bar Committee on Access to the Legal System drafted a proposed amendment to Supreme Court Rule 10–1.1(b), Rules Governing the Investigation and Prosecution of the Unlicensed Practice of Law. The Florida Bar Board of Governors approved the proposal on March 20, 1987. Official notice of the proposed amendment was brought to the Supreme Court's attention on March 25, 1987, and the proposed amendment was published in the April 1, 1987 issue of Florida Bar News. It read

> UPL. The unlicensed practice of law, as prohibited by statute, court rule, and case law of the State of Florida. For purposes of this chapter, it shall not constitute the unlicensed practice of law for nonlawyers to engage in limited oral communication to assist individuals in the completion of legal forms approved by The Supreme Court of Florida. Oral communication by nonlawyers is restricted to those communications essential to elicit factual information necessary for the completion of the form(s) and inform the individual how to file such form(s).

On June 9, 1987, plaintiffs' counsel submitted comments to the Supreme Court "on behalf of Serena Dunn and the other members of the certified plaintiff class in the case of *Serena Dunn, et al. v. The Florida Bar, et al.,* No. 83–243–CIV.–J–12 ... pending before the Honorable Howell W. Melton, United States District Judge for

the Middle District of Florida, Jacksonville Division." Mr. Morrison declared

> If this Court's restrictions on lay assistance were removed, the members of the plaintiff class in *Dunn* could afford to hire these lay persons, since they charge much less than lawyers, and this would enable them to exercise their fundamental constitutional right to obtain dissolutions of their marriages.

> .     .     .     .     .

> In our view, the Bar's petition is definitely a step in the right direction, and we urge the court to support its general thrust. However, we are troubled by some of the restrictions contained in it, and we urge the court to modify them. [W]e believe that the word "essential" should be changed to "reasonably necessary," which would largely eliminate the *in terrorem* effect that now appears. Along the same lines, we believe that the phrase "necessary for the completion of" is also unduly threatening, and we urge that it be changed to "to complete." In the interest of clarity and consistency we would also change the sentence to plural from singular.

The Court was further asked to clarify the final portion relating to informing the individual "how to file such forms(s)." Counsel stated

> Given the purpose of this rule change, we believe that The Bar intended, and the Court should make it clear, that nonlawyers may tell the individuals, for example, how many copies must be filed, what the filing fees are, what is the proper method of payment, how long the typical period is before a hearing will be scheduled, and other matters of a routine administrative nature that are necessary to assure that the matter goes forward, but are hardly the types of information which the rules on the unlicensed practice of law were intended to be conveyed only by members of The Bar.

On July 9, 1987, The Supreme Court of Florida issued a *per curiam* under the caption "The Florida Bar Re Amendment to Rules Regulating The Florida Bar (Chapter 10)." 510 So.2d 596. The *per curiam* began

> The Florida Bar has petitioned this Court to amend chapter 10 of the Rules Regulating The Florida Bar regarding the unlicensed practice of law. The proposed amendments redefine the unlicensed practice of law and move that definition to another location within chapter 10. The bar submits that the new definition will be beneficial by providing better access to the courts while continuing to protect the public from persons not competent to give legal advice.

Continuing,

> Comments to the proposed amendment have been filed by an attorney representing a class of plaintiffs who wish to dissolve their marriages but who cannot afford a lawyer, who are ineligible for legal aid, who cannot currently be assisted by clerks of court, and who are unable to prepare the required papers by themselves. These comments propose alternative language for the second full sentence of the bar's amendment and ask that this Court clarify that nonlawyers may tell individuals, for example, the number of copies to be filed, the amount of filing fees, the proper method of payment, the time period before a hearing will be scheduled, and other matters of a routine administrative nature necessary to assure that the matter goes forward. At oral argument the bar's representative stated that the bar has no objections to these comments and suggestions.

Further continuing

> After considering this matter, we adopt the bar's proposal, as amended by the comments we have received. We also hold that nonlawyers can give information regarding routine administrative matters. Therefore, rule 10–1.1(b) is added, to read as follows, paragraphs (b) through (d) of rule 10–1.1 are renumbered as paragraphs (c) through (e), and rule 10–7.1(a)(5) is deleted, effective immediately.

> > Definition of UPL. The unlicensed practice of law, as prohibited by statute, court rule, and case law of the State of

Florida. For purpose of this chapter, it shall not constitute the unlicensed practice of law for nonlawyers to engage in limited oral communications to assist individuals in the completion of legal forms approved by the Supreme Court of Florida. Oral communications by nonlawyers are restricted to those communications reasonably necessary to elicit factual information to complete the form(s) and inform the individual how to file such form(s).

On July 27, 1987, Mr. Morrison wrote C. Harris Dittmar, Esq., counsel for The Florida Bar, and Mr. Eric J. Taylor, Esq., Assistant Attorney General, Department of Legal Affairs, counsel for the Supreme Court. In part, counsel stated

> As I am sure you are aware by now, the Supreme Court of Florida issued an opinion on July 9, 1987, adopting significant changes to the rules defining the unlicensed practice of law. We had submitted comments on those rules, and when the Bar did not object, the Court went along with them. Based upon this change in the rules which was initiated by the Bar and approved by the Supreme Court of Florida, plaintiffs have now obtained substantially all of the relief which they had sought and, accordingly, there is no reason for them to continue the case. Therefore, I propose that we enter a stipulation dismissing the case with prejudice, save only for the matter of attorneys' fees.

After discussing the matter of attorneys' fees, he stated that he had drafted a stipulation of dismissal "which reserves everyone's rights with respect to fees, establishes a deadline for our fees submission, gives you 30 days to respond, and otherwise dismisses the case with prejudice." Thereafter, a revised stipulation of dismissal with prejudice was filed in the case, "subject to" the parties' positions on attorney fees, set forth *supra* p. 1263.

**2.** The language "vindication of a federal constitutional or statutory right," attributed to *Maher*,

## II.

### A.

Plaintiffs make their application for attorneys' fees pursuant to 42 U.S.C. § 1988, which, in pertinent part, provides: "In any action or proceeding to enforce a provision of [section 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the cost." Before reaching the prevailing party requirements, which the plaintiffs must satisfy, the court takes up the defendants' contention that plaintiff's action, based on 42 U.S.C. § 1983, lacks a constitutional basis. Plaintiffs brought their suit under section 1983, which creates a right of action in law or in equity to address a deprivation of any right secured by the constitution and laws of the United States.

Defendants assert that "[p]laintiffs still will not address the issue of a lack of a violation of an established constitutional right in this case."

> Defendants concede that "a prevailing party" can be awarded attorney's fees. But the purpose behind Congress' enactment of 42 U.S.C. § 1988 is a recompense to a plaintiff for the attorney's fees expended for the "vindication of a federal constitutional or statutory right." *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980); *Martin v. Heckler*, 773 F.2d 1145 (11th Cir.1985).[2]

> Respondent Gagne alleged in her complaint Defendants' practice and policy constitute an invidious discrimination against persons whose work-related expenses exceed the allowances set forth in Index 332.31 and violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by forbidding plaintiff and the class she represents [working recipients of AFDC benefits] ever from controverting the presumption that their work-related expenses exceeding the transportation and food allowances of Index 332.31 are reasonable.

has not been found in the Court's decision.

*Maher*, n. 5. Respondent Gagne's complaint also claimed that defendants' practice and policy violated the Due Process Clause of the Fourteenth Amendment.

Petitioner, Administrator of Connecticut's Aid to Families with Dependent Children Program, amended the AFDC regulations, while discovery was underway, to authorize a deduction for all reasonable work-related expenses. After almost a year and a half interval, respondent filed an amended complaint "alleging that actual expenses in excess of certain standard allowances were still being routinely disallowed." *Id.* 448 U.S. at 126, 100 S.Ct. at 2573. A settlement was negotiated and a consent decree was entered that, in part, provided for a substantial increase in the standard allowance and "gave AFDC recipients the right to prove that their actual work-related expenses were in excess of the standard." [3] *Id.*

After an adversary hearing, the District Court awarded an attorney's fee to respondent Gagne's counsel. The court held that the respondent was "the prevailing party" within the meaning of section 1988 because, without prevailing "in every particular" she had won "substantially all of the relief originally sought in her complaint" in the consent decree. The court rejected the petitioner's argument that the Eleventh Amendment barred fees in the "absence of a judicial determination that the respondent's constitutional rights had been violated." The Court of Appeals affirmed; and the Supreme Court granted *certiorari* to consider "both the statutory [4] and constitutional claims."

The Court found "no merit in petitioner's suggestion that respondent was not the prevailing party within the meaning of § 1988." The Court held

The fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees. Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated. Moreover, the Senate Report expressly stated that "for purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief." S.Rep. No. 94–1011, p. 5 (1976). *Id.* at 129, 100 S.Ct. at 2575.

Petitioner Maher argued that "regardless of Congress' intent, a federal court is barred by the Eleventh Amendment from awarding fees against a State in a case involving a purely statutory, non-civil-rights claim." Rejecting the argument, the Court stated

In this case, there is no need to reach the question whether a federal court could award attorney's fees against a State based on a statutory, non-civil-rights claim. For, contrary to petitioner's characterization, respondent did allege violations of her Fourteenth Amendment due process and equal protection rights, which the District Court and the Court of Appeals both held to be sufficiently substantial to support federal jurisdiction under *Hagans v. Lavine*, 415 U.S. 528 [94 S.Ct. 1372, 39 L.Ed.2d 577]. *Id.* at 130, 100 S.Ct. at 2575.

Directly pertinent to the present threshold question the Court then noted

Although petitioner is correct that the trial judge did not find any constitutional violation, the constitutional issues re-

---

**3.** The Court noted that the consent decree "did not purport to adjudicate respondent's statutory or constitutional claims." The decree stated that "[n]othing in this Consent Decree is intended to constitute an admission of fault by either party to this action." *Maher*, n. 8.

**4.** Not directly pertinent to the present case, the Court rejected petitioner's argument that "Congress did not intend to authorize the award of attorney's fees in every type of § 1983 action, but rather limited the court's authority to award

fees to cases in which § 1983 is invoked as a remedy for a constitutional violation or a violation of a federal statute providing for the protection of civil rights or equal rights." In doing so, the court followed *Maine v. Thiboutot*, decided the same day, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), holding that "§ 1988 applies to all types of § 1983 actions, including actions based solely on Social Security Act violations." *Maher* at 128, 100 S.Ct. at 2574.

mained in the case until the entire dispute was settled by the entry of a consent decree. Under these circumstances, petitioner's Eleventh Amendment claim is foreclosed by our decision in *Hutto v. Finney,* 437 U.S. 678 [98 S.Ct. 2565, 57 L.Ed.2d 522].

*Id.* at 131, 100 S.Ct. at 2575.

The Court agreed

with the courts below that Congress was acting within its enforcement power [Fourteenth Amendment, § 5] in allowing the award of fees in a case in which the plaintiff prevails on a wholly statutory, non-civil-rights claim pendent to a substantial constitutional claim or in one in which both a statutory and a substantial constitutional claim are settled favorably to the plaintiff without adjudication.

*Id.* at 132, 100 S.Ct. at 2576.

Thus, adjudication of a constitutional claim is not a prerequisite to establishing prevailing party status.[5]

In *Hewitt v. Helms,* 482 U.S. 755, 107 S.Ct. 2672, 2673, 96 L.Ed.2d 654 (1987), the Court, in determining prevailing party status, restated the section 1988 interpretation of *Hanrahan v. Hampton,* 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980)

Respect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail.

*Hewitt* also reaffirms the result and does not retract any of the reasoning of *Maher v. Gagne*

Helms obtained no relief. Because of the defendant's official immunity he received no damages award. No injunction or declaratory judgment was entered in his favor. Nor did Helms obtain relief

without benefit of a formal judgment— for example through a consent decree or settlement. *See Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980).

Consistent with *Maher v. Gagne,* the Eleventh Circuit, in *Doe v. Busbee,* 684 F.2d 1375, 1379 (11th Cir.1982),[6] acknowledged, "as the legislative history notes, parties may be considered to have prevailed when they *vindicate* rights through a consent judgment or without formally obtaining relief. S.Rep. No. 94–1011, at 5 (emphasis added)." The Court further noted

For example, a party may be considered to be "prevailing" if the litigation successfully terminates by a consent decree, an out-of-court settlement, a voluntary cessation of the unlawful practice by the defendant, or other mooting of the case where the plaintiff has vindicated his right.

*Doe v. Busbee* noted among Fifth Circuit "prevailing party" cases *Iranian Students Association v. Sawyer,* 639 F.2d 1160 (5th Cir.1981). A party prevails "if their lawsuit was a significant catalytic factor in achieving the primary relief sought through litigation despite failure to obtain formal judicial relief." *Iranian Students* at 1163. In *Iranian Students,* in note 6 at 1164, the court observes

Although it is true no fees could be awarded had the court ruled no rights were violated, it would be ineffectual to require the court to hear the complete litigation on a matter already moot. It is enough to meet the legal requirements to be sure the litigation is not "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg*

---

5. Justice Powell dissented in *Thiboutot.* Yet he concurred in *Maher v. Gagne,* 448 U.S. at 133–5, 100 S.Ct. at 2576–77, because "the complaint included a substantial constitutional claim which 'remained in the case until the entire dispute was settled by the entry of a consent decree.' *Ante,* at 131, [100 S.Ct. at 2575]."

6. *Casines v. Murchek,* 766 F.2d 1494, 1503 (11th Cir.1985), recognizes the *Doe v. Busbee* "prevailing party" test stated at page 1381

[I]n order to be a prevailing party, a plaintiff must achieve significant relief to which [s]he was entitled under the civil rights laws through [her] success on the merits, favorable settlement, or voluntary actions by the defendants.... However, consistent with the policy underlying section 1988, the plaintiff must in some way vindicate a civil right at issue in the litigation against the violator of that civil right in order to be considered a 'prevailing party.'

*Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978).

A year later, another Fifth Circuit panel stated a similar threshold requirement in a larger context in *Williams v. Leatherbury*, 672 F.2d 549, 551 (5th Cir.1982)

> Indeed, a defendant may unilaterally undertake action that moots the suit. In such a case, a plaintiff may still recover attorney's fees if he can show both a causal connection between the filing of the suit and the defendant's action and that the defendant's conduct was required by law, i.e. not a wholly gratuitous response to an action that in itself was frivolous or groundless. (citations omitted).

Adding to this formulation, *Garcia v. Guerra*, 744 F.2d 1159, 1163 (5th Cir.1984) declares that "[a] claim is not frivolous if it is arguably supported by case or statutory law." Concurring, Judge Randall faulted the panel for "considering the merits of the issue at all. Under the *Leatherbury* standard, the panel should have held only that the appellant's claim was colorable, while intimating no opinion on its merits." *Garcia* at 1166. It is evident that Judge Randall used a "colorable claim" as interchangeable with a claim that is "arguably supported by case or statutory law."

Based on *Doe v. Busbee*'s acceptance of *Iranian Students* it is concluded that the Eleventh Circuit would also accept and apply these similar Fifth Circuit holdings in deciding whether a section 1983 litigant has shown threshold entitlement to resort to the section 1988 attorney's fee statute. These cases generally support the plaintiff's position, in their last brief, that it is "enough to show that he had a colorable constitutional claim," However, this court

holds that a "colorable claim" is one that is "arguably supported by case or statutory law."

## II.

### B.

■ The plaintiffs "recognize that defeating a motion for summary judgment is not sufficient to satisfy the requirement that a plaintiff prevail in order to be entitled to a fee, but [they] are not relying upon the defeat of the motions for summary judgment for that purpose." Rather, they say "[t]he defeats of the motions for summary judgment are relevant solely to establish that plaintiffs had a substantial constitutional claim and hence had met this threshold." Defendants counter

> These Defendants submit that the Plaintiffs have failed to establish, through any means, that there exists a constitutional right of access to the courts through an unlicensed lay assistant. They have not even attempted to show that such a "right" is available or that any court has ever addressed the issue as applied to a class like the Plaintiffs'.[7]

Continuing

> The Plaintiffs instead, attempt to bootstrap their conclusory statements of the existence of such a right by stating that they overcame a motion to dismiss and a motion for summary judgment and, therefore, such a right must exist. While the Plaintiffs do not rely upon these denials to "satisfy the requirement that a plaintiff prevail in order to be entitled to a fee", they rely on the denials to "establish that plaintiffs had a substantial constitutional claim."

In its motion for summary judgment, the Florida Bar argued that the United States

---

7. The New York Court of Appeals in *In re Smiley*, 36 N.Y.2d 433, 369 N.Y.S.2d 87, 92–93, 330 N.E.2d 53, 57 (1975), held that in a divorce proceeding an indigent party is not entitled, as a matter of constitutional right, to a court appointed attorney. The court stated that "on no view of the matter is counsel required in a matrimonial action as a condition to access to the court. Of course, counsel is always desirable, and in complicated matrimonial litigation would be essential. But however desirable or

necessary, representation by counsel is not a legal condition to access to the courts." This decision is more persuasive than the short unanalyzed holding in *Bradley v. Jones*, 297 So.2d 198 (La.1974). In any event, since courts have not held there is a clearcut right to counsel in a civil domestic relations case, it is no wonder that no court has held that "there exists a constitutional right of access to the courts through an unlicensed lay assistant."

Supreme Court's dismissal of the appeal in *Furman v. The Florida Bar*, 444 U.S. 1061, 100 S.Ct. 1001, 62 L.Ed.2d 744 (1980), constituted an adjudication, adverse to the present plaintiffs, on the merits of the constitutional issue presented there and claimed here. As set forth in *Furman's* Supreme Court jurisdictional statement, that issue was "[w]hether a state may constitutionally apply its otherwise valid rules prohibiting the unauthorized practice of law to preclude indigents from utilizing lay services that are essential to exercise the fundamental right to obtain a divorce."

Judge Melton recognized that the "same constitutional argument is made in the present [*Dunn*] case." However, he concluded that the Supreme Court's dismissal of the *Furman* appeal may have had an alternative basis, namely that the "appellant [*Furman*] lacked standing to raise the rights of indigents as a defense in an action brought against her by the state." Based on Supreme Court authorities he examined, he determined "it would appear highly plausible that the *Furman* appeal was dismissed on the basis of standing, rather than on any substantive ground." Finding that the *Furman* dismissal has no "precedental impact" he denied The Florida Bar's motion for summary judgment. Given the nature of this ruling, Judge Melton's denial of The Florida Bar's motion for summary judgment does not "establish" that in the Third Amended Complaint "the plaintiffs had a substantial constitutional claim."

Judge Melton began his consideration of The Florida Supreme Court's motion for summary judgment by reciting its arguments. He then stated

> As can be discerned from the general nature of these arguments and from the fact that the Florida Supreme Court has presented no supporting affidavits attacking the factual predicate of plaintiffs' claim, this motion for summary judgment is tantamount to a motion to dismiss for failure to state a claim upon which relief can be granted, and the Court will analyze the motion accordingly.

The court next observed that similar arguments were raised in the Florida Bar's earlier motions to dismiss the plaintiffs' amended complaint (which he denied on January 5, 1984). He stated that "in so doing, the Court implicitly rejected these contentions" and had no reason "to revisit its previous ruling." In that earlier ruling no constitutional issue was expressly considered or resolved. In one sentence it adjudged that "the motion to dismiss filed by defendants The Florida Bar and James C. Rinaman, Jr., as President of The Florida Bar, is hereby denied." This court concludes that he may not regard, and he will not treat that denial as establishing that "the plaintiffs had a substantial constitutional claim."

In his order of November 10, 1986, Judge Melton then declared

> Even if the Court were not bound by its earlier ruling on these arguments, it would nonetheless deny the Florida Supreme Court's motion. As mentioned in section one of this Order, the issue presented in this case is the constitutionality of Florida's laws precluding lay assistants from aiding members of the plaintiff class in obtaining dissolution of their marriages.

He thus defined, but did not attempt to decide the constitutional question in the case

> In addressing this constitutional question, the Court faces at least one major factual question: whether the members of the plaintiff class have actually been denied access to the courts based on a state created barrier.

Culminating his ruling, Judge Melton declared

> Because this question requires an examination of the practical results of the challenged regulations, and because the access issue will in this case be a question of degree, the Court is of the opinion that this case cannot be decided until after the presentation of evidence.

By ruling that he could not resolve the constitutional question until he addressed the stated factual question, it is plain that the court made no ruling on the constitu-

tional question. Hence, there is no support for the plaintiffs' arguments

The defeats of the motions for summary judgment are relevant solely to establish that plaintiffs had a substantial constitutional claim and hence had met this threshold.

The "major factual question" shaped by Judge Melton refers to "access to the courts" and whether members of the plaintiff class have been denied that "access to the courts based on a state created barrier." The question of "access" may be answered on the facts stated in the Third Amended Complaint as modified by the deposition testimony of the plaintiffs.

■ Plaintiffs allege that the Supreme Court has determined that lay assistants "may not communicate orally with their customers and must obtain all information from their customers in writing." Plaintiffs further allege that "Plaintiff Dunn was unable even to read and comprehend the written instructions for Ms. Furman's intake form and provide the necessary information in writing." However, the deposition testimony of Ms. Dunn makes clear that she took the "intake form," given to her by Ms. Furman, and then a friend, Erlene, and Erlene's mother went over the piece of paper with her and tried to explain things to her that she did not understand. She filled out her name, her address and "the certain date that [she] got married." She also included her husband's name. Rather than "refuse to assist" Ms. Dunn, as claimed in the Third Amended Complaint, Ms. Furman, according to Ms. Dunn, said that "the only thing she could do was see what she could do." [8]

Thus, it is evident that The Florida Supreme Court's unauthorized [unlicensed] practice of law rules, and The Supreme Court's then prohibition of oral communications between lay assistants and their customers, actually did not prevent Ms. Dunn, although partially illiterate, from getting a friend to help her fill out the divorce "intake form" furnished her by Ms. Furman. Moreover, enforcement of such rules, as they relate to lay assistants, did not prevent Ms. Dunn from returning the completed divorce "intake form" to Ms. Furman, or prevent Ms. Furman from preparing and filing the divorce papers in court. Also, it appears that other illiterate persons seeking a divorce, with the help of family or friends, would be able to fill out the divorce "intake forms." Once filled out, the divorce "intake form" would permit the lay assistant to prepare and file the divorce papers in court. In view of Ms. Dunn's admissions, any claimed class of illiterate or indigent persons is not shown to be denied access to court to file divorce papers through the inability to use a lay assistant.

The deposition testimony of Willie Wiggs, similarly indicates that he was able to complete the divorce "intake form" provided him by Ms. Furman. His testimony further reveals that when his wife returned the unsigned papers to him (which prevented use of the simplified dissolution of marriage procedure) he took them to Ms. Furman. She said "I'm going to have to hold these." Since the papers were completed there was no apparent reason for Ms. Furman not proceeding to file divorce papers for Mr. Wiggs. He had paid her $50, her standard fee, and an extra fee of $25. Hence, it is concluded that, on his own admissions, he cannot contend that The Supreme Court's enforcement of the unauthorized (unlicensed) practice of law rules prevented his access to the divorce court of the Fourth Judicial Circuit of Florida, through a lay assistant, to file a divorce action against his wife.

As to the third plaintiff, Marva Pamella Evans, her deposition testimony reveals that she engaged Ms. Furman, that she paid Ms. Furman her fee, and that she

---

**8.** Ms. Furman, in her deposition, testified that she told Ms. Dunn "I can give you written material, I can give you typed material, but I cannot answer your questions. Take these away and have someone read them to you." She further testified that "if [Ms. Dunn] can find some way that she can get the information on this sheet, I will do the divorce." However, she did not testify that Ms. Dunn returned the completed papers to her. Even if this were regarded as contradicting Ms. Dunn it cannot diminish the binding effect of plaintiff Dunn's statements of what occurred.

filled out forms on divorce which she understood and gave a copy to Ms. Furman. However, she did not receive back from Ms. Furman a document "all typewritten and set to go to the court here in Florida." Moreover, it is possible that "her husband might go with her down to the courthouse and sign the papers for her to get a divorce." Based on her admissions, it is not clear that Ms. Furman cannot assist Evans in filing a simplified dissolution of marriage petition. In short, on her own deposition admissions, plaintiff Evans has not shown that she has been denied access to divorce court, through employment of a lay assistant.

■ Summarizing this section, even if one assumes the validity of the constitutional theory that the plaintiffs have sought to advance, the deposition admissions of the three plaintiffs fail to support the Third Amendment factual claims or statements which are asserted in support of that constitutional theory. If a complaint allegation is at odds with the deposition testimony of a plaintiff, the court must accept the testimony. Plaintiffs are bound by sworn deposition testimony when it varies from a complaint allegation.

In the next section the plaintiffs' constitutional theory is evaluated.

## II.

### C.

■ In his application for attorneys' fees, Alan Morrison states

During the course of my representation of Ms. Furman, I developed the core legal theory upon which this lawsuit was based: That under cases such as *Boddie v. Connecticut*, 401 U.S. 371 [91 S.Ct. 780, 28 L.Ed.2d 113] (1971), and *Johnson v. Avery*, 393 U.S. 483 [89 S.Ct. 747, 21 L.Ed.2d 718] (1969), the state may not constitutionally deny access to the legal system to those unable to pay for matters such as a divorce over which the state had a monopoly, and that the rules on unauthorized practice of law created, for those who were unable to afford legal services, precisely the same kind of

barriers to access that the Supreme Court struck down in *Boddie* and *Johnson*.

In its post-hearing brief defendant Supreme Court urges

The only cases cited by the plaintiffs did not address the issues raised here. *Avery v. Johnson*, 393 U.S. 483 [89 S.Ct. 747, 21 L.Ed.2d 718] (1969) concerned the right of access to contest the status of confinement by incarcerated persons and *Bod[d]ie v. Connecticut*, 401 U.S. 371 [91 S.Ct. 780, 28 L.Ed.2d 113] (1971) dealt with the *direct* blocking of the courthouse door to *pro se* litigants themselves through the use of a filing fee. Plaintiffs want to elevate these cases to apply to, at best an indirect barrier to the Plaintiffs' access to the courts, for they do not allege that the defendants are directly stopping them from getting a divorce.

In *Boddie*, the issue was the constitutionality of a Connecticut statute whose service of process provisions required payment of court fees and expenses as a condition precedent to obtaining court relief. The Court held

In concluding that the Due Process Clause of the Fourteenth Amendment requires that these appellants be afforded an opportunity to go into court to obtain a divorce, we wish to re-emphasize that we go no further than necessary to dispose of the case before us, a case where the *bona fides* of both appellants' indigency and desire for a divorce are here beyond dispute ... Thus we hold only that a State may not, consistent with the obligations imposed on it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve this legal relationship without affording all citizens access to the means it has prescribed for doing so.

*Id.* at 382, 383, 91 S.Ct. at 788, 788–789.

In *Logan v. Zimmerman Brush Company*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) the Court, at 430 n. 5, 102 S.Ct. at 1154 n. 5, noted that in *Boddie* "the States' imposition of substantial filing and other fees upon indigents seeking divorces

was held to deny them due process." Manifestly, the State of Florida has not imposed "substantial filing and other fees upon indigents seeking divorces." Indeed, plaintiffs do not deny that indigents have access to Florida divorce courts to proceed *pro se* and without the payment of filing fees.

What the plaintiffs are endeavoring to do is to extend *Boddie* to establish the constitutional theory advanced by their counsel. However, the Supreme Court, itself, has pointed out that *Boddie* should not be extended beyond its actual holding. In *United States v. Kras*, 409 U.S. 434, 450, 451, 93 S.Ct. 631, 640, 641, 34 L.Ed.2d 626 (1973) the Court declined "to extend the principle of *Boddie* to the no asset bankruptcy proceeding." In support of its decision, the Court re-examined *Boddie*

> Mr. Justice Harlan, in his opinion for the Court in *Boddie*, meticulously pointed out, as we have noted above, that the Court went "no further than necessary to dispose of the case before us" and did "not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual." 401 U.S. at 382–383 [91 S.Ct. at 788–789]. The Court obviously stopped short of an unlimited rule that an indigent at all times and in all cases has the right to relief without the payment of fees.

In view of the Court's express limitation of the breadth of *Boddie* to its actual holding, it is concluded that *Boddie* may not be extended to validate the plaintiffs' constitutional theory. Connecticut's imposition of costs in *Boddie* directly blocked access to indigents seeking marriage dissolution in its courts. The barrier charged here is not clear cut. The claimed barrier consists of an uncertain challenge to Florida's regulation of lay assistants' possible illegal practice of law.

In their Third Amended Complaint, plaintiffs say that "[a]s a result of the combination of [plaintiffs'] limited resources and the Florida restrictions on lay assistants, plaintiffs and the other members of the plaintiff class are precluded from exercising their fundamental right to obtain a dissolution of their marriages, over which Florida maintains a monopoly." The alleged interference with indigents' access to the Florida courts to seek dissolution of their marriages thus turns on indigents' use of lay assistants whose activities are admittedly subject to the Supreme Court's jurisdiction in regulating the unauthorized (unlicensed) practice of law.

In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975), the Court recognized that "the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad powers to establish standards for licensing practitioners and regulating the practice of professions." *Citing Bates and Van O'Steen v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), The Florida Supreme Court, in *Florida Bar v. Brumbaugh*, 355 So.2d 1186 (Fla.1978), sought to balance its responsibility to regulate the unauthorized practice of law by lay assistants with the right of all citizens to have access to Florida courts to represent themselves, guaranteed by Article I, Section 21 of the Florida Constitution (1968), and by *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The court, in *Florida Bar v. Brumbaugh* at 1191, observed that "persons not licensed as attorneys are prohibited from practicing law within this state" but that "it is somewhat difficult to define exactly what constitutes the practice of law in all instances." Yet, it has done so in *State v. Sperry*, 140 So.2d 587, 591 (Fla.1962). At the same time, it observed that the prohibition of the practice of law by those not examined and found qualified is not to "aid or protect the members of the legal profession." It is done

> to protect the public from being advised and represented in legal matters by unqualified persons over whom the judicial department can exercise little, if any,

control in the matter of infractions of the code of conduct which, in the public interest, lawyers are bound to observe.

*State v. Sperry* at 595. Given The Florida Supreme Court's power, and the public need of the Court's power, to regulate both the authorized and the unauthorized practice of law, plaintiffs' attempt to extend *Boddie* to strike down or curb the Florida's restrictions on lay assistants is misconceived and misdirected.

As seen, *Boddie* deals with access to Connecticut's courts, "the sole means in Connecticut for obtaining a divorce." Since access to Florida's courts to obtain marriage dissolution is the subject of *Dunn,* the present case, *Boddie,* as a matter of facial impression, may have appeared to plaintiffs' counsel to be relevant in developing his constitutional theory. But, analysis shows that *Boddie* does not warrant or justify that theory. Additionally, with due deference to the ingenuity of plaintiffs' counsel in developing constitutional theory, the incarcerated status of plaintiffs in *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), limits that case's applicability to prison situations. The case cannot support counsel's theory. It held that "unless and until the State provides some reasonable alternative to assist inmates in the preparation of petitions for post-conviction relief, it may not validly enforce a regulation such as that here in issue, barring inmates from furnishing such assistance to other prisoners." *Id.* at 490, 89 S.Ct. at 751.

*Boddie v. Connecticut* and *Johnson v. Avery* are the only cases counsel has cited to support his contention that the Third Amended Complaint is "enough to show that he had a colorable constitutional claim." Treating a "colorable claim" as one that is "arguably supported by case or statutory law," these cases do not "arguably" support the plaintiffs constitutional claim.

Hence, it is concluded that plaintiffs have not established their threshold entitlement to attorneys' fees under section 1988. Nevertheless, the court will proceed to rule upon the other requirements of section

1988, which rulings would become timely and controlling if the court were reversed on the threshold entitlement ruling.

### III.

#### A.

█ Part I.B. sets forth, *supra* at pp. 1266–67, The Florida Supreme Court *Per Curiam* of July 9, 1987 revision of the Court's Unlicensed Practice of Law Rule. Part I.B. also reviews certain events that preceded the Rule adoption. Based on these events, plaintiffs assert that "this case is the clear 'but for' catalyst that caused the Rule change, but the Court need not go that far, since this case was plainly a substantial factor, and that is all that is required in order for plaintiffs to become prevailing parties." Plaintiff cites *Taylor v. City of Fort Lauderdale,* 810 F.2d 1551, 1560 (11th Cir.1987)

> Analysis [of the prevailing party question] hinges upon whether "the lawsuit is a substantial factor or a significant catalyst in motivating defendants to end their unconstitutional behavior." [*Doe v. Busbee,* 684 F.2d 1375, 1380 (11th Cir.1982).]

Relying on *Taylor* and the same language, defendant The Florida Bar argues

> Even if the Court finds that the rule change by The Florida Supreme Court gave the plaintiffs substantially what they sought, this is not enough to declare plaintiffs "prevailing parties" unless "the lawsuit is a substantial factor or a significant catalyst in motivating defendants to end their unconstitutional behavior." *Taylor* ... Thus, plaintiffs must show a *direct causal relationship* between their lawsuit and the actions of the defendant. *Hewitt v. Helms,* 482 U.S. 755, 107 S.Ct. 2672, 2677, 96 L.Ed.2d 654 (1987).

Defendant, The Florida Bar, points to the "ongoing efforts of The Bar and The Florida Supreme Court to deal with the difficult issue of access to the courts." It also notes that Justice Ben F. Overton of The Florida Supreme Court testified at the March 24, 1988 hearing "concerning the substantial efforts of The Supreme Court

and The Florida Bar to improve access to the courts."

Here are the most relevant of the Bar cited actions of The Supreme Court and The Bar. In *Florida Bar v. Furman*, 376 So.2d 378, 382 (Fla.1979) (Furman I), in addition to directly ruling on the *Furman* case, the Supreme Court directed "The Florida Bar to begin immediately a study to determine better ways and means of providing legal services to the indigent." The Court's direction produced "The Legal Needs of the Poor and Underrepresented Citizens of Florida: An Overview", that was prepared by the Center for Governmental Responsibility, Holland Law Center, University of Florida. The report was submitted to The Florida Bar on January 10, 1980. It included a section on "Paralegals: Legal Assistance by NonLawyers" that noted, among other things, "the limited paralegal practices under the *Furman* decision."

As reported in 450 So.2d 810 (Fla.1983), The Florida Supreme Court, on December 8, 1983, granted The Florida Bar's June, 1982 petition to amend Florida Rule of Civil Procedure 1.611 "to provide a simplified procedure by which dissolution of a marriage of short duration can be obtained by the parties without their having to employ private counsel."

By an order of May 3, 1984, The Florida Supreme Court then put into effect the simplified marriage dissolution procedure. The parties to the dissolution of marriage proceeding may file with the clerk of circuit court, a petition for simplified dissolution of marriage. However, the parties are required to certify that no children were born to, or adopted by, the parties; and that the parties have made provision for the division of their property.

The Florida Bar, in 1982, created a Long-range Planning Committee. It reported in 1984, and its recommendations included the Bar's commitment to simplified legal documents and court forms.

A Commission on Access to the Legal System, composed of 16 members, was appointed by the Governor of Florida, the Chief Justice of The Florida Supreme Court, and the President of The Florida Bar. The purpose of the Commission was to explore various alternatives "which would increase access to the legal system on the part of the poor and middle class." Its report of June, 1985, in a section on "Legal Services to the Poor," declared

We see only two solutions which can provide any real relief to this need: (1) Money to hire lawyers to represent the poor; (2) Time devoted by private lawyers to representation of those who cannot pay. Other solutions, such as simplification of procedures so people can represent themselves can provide some relief but cannot come close to addressing the need.

In the view of the Commission, "adoption of standards for public service for lawyers within the state and modification of the Interest on Trust Account Program to require participation by all lawyers are essential to any meaningful solution to the legal needs of the poor."

As a result of these two reports, the Board of Governors established a Board Committee on Access to the Legal System in 1985.

It is evident that The Florida Bar and The Florida Supreme Court have taken positive steps to increase and improve the delivery of legal services to the poor. This has been particularly true in the field of matrimonial law. However, in the context of the prevailing party issue, it is not enough to assume that The Supreme Court's July 9, 1987 revision of the Unlicensed Practice of Law Rule directly evolved from the above catalogued actions of The Florida Bar and The Supreme Court. As *Martin v. Heckler*, 773 F.2d 1145, 1151 (11th Cir.1985), has observed "it often appears that time would eventually cure the problem." Rather, proof is needed that would directly link the foregoing actions of The Florida Bar to the revision of The Supreme Court's Unlicensed Practice of Law Rule. That proof is lacking. Additional events, which this court finds more relevant, are developed in the record.

In Serena Dunn's memorandum of May 5, 1983, she stated

She simply seeks an order prohibiting the defendants from enforcing the portion of the unauthorized practice rules that prevents oral communications between lay persons and clients, such as plaintiff Dunn and those similarly situated, i.e., others in need of assistance in obtaining a divorce or in exercising other fundamental rights, such as adoption or a name change, for which the state maintains a monopoly, and who cannot afford a lawyer and who cannot use lay assistants because they cannot complete the required forms.

Thus, soon after she filed her complaint, plaintiff Dunn directly asked as relief, total cessation of the prohibition against "oral communication between lay persons and clients."

At the oral hearing of December 2, 1985, on defendants' summary judgment motions, Judge Melton engaged in colloquy with counsel. In much lesser scope than the unlimited permission for lay assistants to engage in oral conversations with customers in filling out divorce papers, sought by the plaintiff on May 5, 1983, Judge Melton, in the following colloquy, suggested that a lay assistant should be allowed to engage in the following type of oral conversation with a customer:

I can't see anything wrong with [a lay assistant] telling [clients], You've got the wrong answer there. It's not the right answer to that question You just go back and fill them in.

As I understand The Florida Bar's position now is that you can't do that. You can't tell them that—the example I gave you, he was married on March 15th, 19[8]2. The lay assistant writes down March 15th, 1992. And then he finishes it up and that's it. Then he or she pays the lay assistant whatever it is and they go on their way. Take it down to the judge and the judge is going to say, Well we haven't even reached the date you were married yet.

That's the problem it looks like to me that's in this whole case. It looks a lot simpler to me than it is to you gentlemen. I can tell that.

Later the court said

Now it seems to me though this: That assuming—let's get away from the constitutional ground just a moment. And let's just talk about what's right and what's wrong. It's a problem that I recognize because I've got several volumes here of it already. You have spent a lot of time. . . .

Therefore, if we have a problem and The Florida Bar and the Supreme Court and these parties can solve the problem for these people, even though maybe they have—let's assume for the sake of what we're talking about now that they really have no right to it, that there's no constitutional right and really they shouldn't— maybe nothing could be done about it unless somebody does. What's wrong with correcting a wrong just for the sake of doing something that would be in the best interests of everyone?

Mr. Taylor: From my personal standpoint, not a thing.

In an order of November 10, 1986, Judge Melton denied defendants' motions for summary judgment. It is discussed more fully *supra*, at pp. 1270–72. The Florida Bar reports that in the same month, "November, 1986 [the Unlicensed Practice of Law/Access Joint Committee] met jointly with the Board of Governors' Committee on Access to the Legal System and recommended that the latter study and take action regarding access to the courts." Later, on February 18, 1987, Mr. Dittmar, The Florida Bar's counsel, revealed that Judge Melton's views were reported to The Florida Bar Committees. Undoubtedly, minutes of those Committee meetings, had they been produced in this proceeding, would have shown that. Moreover, the affidavit of Steven J. Uhlfelder, Chairman of The Florida Bar's Access to the Legal System Committee, is not to the contrary.[9]

9. Steven J. Uhlfelder, Chairman of The Florida Bar's Access to the Legal System Committee, states, in an affidavit, that the Committee "has met regularly and coordinates its activities closely with the Delivery of Legal Services Committee." Without further detail, Mr. Uhlfelder states

At the status conference of February 18, 1987, Judge Melton was advised of Bar committee activities. Judge Melton asked Harris Dittmar, counsel for The Florida Bar

Have there been any further efforts in settlement of this case ... because I talked with you about things that I express some concern [ ] with before. I'm not going into those again ...

Mr. Dittmar responded

Your Honor, I am pleased to report to you that the problem of access to the courts in all areas, and particularly in the area of dissolution of marriages, has been addressed over the last five or six years and is continuing to be addressed actively by committees of The Florida Bar

.     .     .     .     .

I think Your Honor is certainly entitled to know what's going on, and we plan to make a full showing of it. And hopefully it will impress not only Your Honor but Mr. Morrison, the things that are going on. I'm really not kept in day to day contact with them. I'm no longer in the Board of Governors or the leadership of the Bar, nor am I active on any of the committees that are addressing these. So I can't tell you firsthand. But I just don't see anything to be gained by that sort of [settlement] session.

But the problems that Your Honor mentions specifically were all communicated to the leadership of the Bar and have been sent to the appropriate commitees. And I know for a fact that each of them is trying to find some way to address them.

A month later, on March 20, 1987, The Florida Bar Board of Governors approved the proposed amendment to The Supreme

Court's Unlicensed Practice of Law Rule, *supra* at p. 1265. This had been drafted by the Committee on Access to the Legal System.

The content, as well as the juxtaposition, of the foregoing relevant events convince this court, and it is concluded, that the prosecution of the *Dunn* case was "a substantial factor or a significant catalyst in motivating" defendant The Florida Bar to propose to The Florida Supreme Court the revised Unlicensed Practice of Law Rule. A clear causal connection between the prosecution of the *Dunn* case and The Florida Bar's proposed revised Unlicensed Practice of Law Rule has been established.

This is nonetheless true because the proposed revision represented a further effort on the part of The Florida Bar to increase and improve the delivery of legal services to the poor in the State of Florida. Nor is the causative connection diminished because Judge Melton's expression of views at the *Dunn* hearings of December 2, 1985 and February 18, 1987, undoubtedly stimulated The Florida Bar in accomplishing the proposed revision. Judge Melton's remarks were relevant to the hearing's consideration of the claimed constitutional issue; and since the remarks led to the Rule revision and the voluntary dismissal of the case, the case formed the catalyst and a strong link in the causal connection. Moreover, a voluntary dismissal falls within *Maher v. Gagne*'s range of disposition that may invoke section 1988.

Since The Supreme Court revised the Unlicensed Practice of Law Rule, in accordance with the revised rule proposed by The Florida Bar, it follows that the prosecution of the *Dunn* case is also causally related to The Supreme Court's adoption of the revised rule. Moreover, The Supreme Court's incorporation of the wording

In continuation of the Bar's interest in simplifying and streamlining procedures to simple dissolutions of marriage and other legal procedures, the Board and the Access Committee has considered ways to make it easier for citizens to complete these procedures. One of the proposals which the Committee approved and the Board adopted is a change to the Unauthorized Practice of Law Rules which would allow nonlawyers to engage in limited

oral communications to assist individuals in the preparation of legal forms approved by the Supreme Court and inform the individuals on how to file such forms.

Also, Michael Tartaglia, The Florida Bar's Director, Public Interest Programs, states that in January, 1987, he met with UPL counsel Mary Ellen Bateman about a proposal to allow lay persons to assist individuals with completing dissolution of marriage forms and filings.

changes suggested by plaintiffs' counsel, even though not done in the course of the *Dunn* case, does not break the chain of causation.

Therefore, if the plaintiffs had established their threshold constitutional entitlement under section 1983, to seek attorneys' fees under section 1988, plaintiffs would be found to be the prevailing party under section 1988.

### III.

### B.

Subject to the condition previously stated, the court proceeds to calculate a "reasonable attorney's fee" which may be "allow[ed] the prevailing party" under section 1988. *Norman v. Housing Authority,* 836 F.2d 1292, 1299 (11th Cir.1988), observes that

> The Supreme Court elected the lodestar approach because it produces a more objective estimate and ought to be a better assurance of more even results.

Further

> Under *Hensley* [*v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) ] the starting point in any determination for an objective estimate of the value of a lawyer's services is to multiply hours reasonably expended by a reasonable hourly rate, 461 U.S. at 433, 103 S.Ct. at 1939.

■ Attention is first turned to fixing a reasonable hourly rate, the major area of dispute. Mr. Morrison seeks an hourly rate of $215. He asserts that this is a reasonable rate in federal complex litigation in the Washington, D.C. area in which he practices. Defendant The Florida Bar, on the other hand, takes the position that while "the hourly rates for Mr. Morrison and his associate may be appropriate for the District of Columbia, they are higher than those found in local practice, and a reduction in the hourly rates may be appropriate. *Donaldson v. O'Connor,* 454

F.Supp. 311, 314–15 (N.D.Fla.1978)." The *Donaldson* court recognized that "as a general matter, the fees customarily charged in the community where the lawsuit is prosecuted will govern the amount of fees to be awarded under section 1988." *Donaldson* thereupon held that "where, as here, a plaintiff can show he has been unable through diligent, good faith efforts to obtain local counsel, attorney's fees under 42 U.S.C. § 1988 are not limited to the prevailing rate in the district where the case is tried." [10] Under *Donaldson,* it becomes a factual question whether a civil rights attorney of sufficient experience and capability was available in the Jacksonville legal community.

In its memorandum of January 15, 1988, defendant The Florida Bar states

> Defendants recognize Mr. Morrison's abilities and his familiarity with the issues presented in this case; nevertheless, plaintiffs employment of William Sheppard, an eminently qualified civil rights attorney, as local counsel demonstrates that there was qualified local counsel available to litigate plaintiffs' claim.

However, in his affidavit of February 26, 1988, William Sheppard states under oath

> I hereby unequivocally state that I would not have undertaken the primary representation of the plaintiff class in this case. I am uncertain as to whether I have the necessary resources to undertake a matter of this magnitude.

Augmenting this affidavit, Mr. Sheppard testified on March 24, 1988 that in 1983 he was appointed by the late Judge Scott of the Jacksonville Division of the Middle District "to assume the responsibility of representing the inmates who are incarcerated now in 35 major prisons, in Florida and probably 100 minor prisons." The class consists of 34,000 people. He states that he has been "consistently and regularly, on a daily basis, involved in representing the members of that class since my appointment." Other testimony of Mr. Sheppard

---

**10.** Usually the reasonable hourly rate is that prevailing in the community for similar work. *See Copeland v. Marshall,* 641 F.2d 880, 892 (D.C.Cir.1980), and *Donnell v. United States,* 682 F.2d 240, 251 (D.C.Cir.1982). *Donnell* at 252 n. 33 recognizes *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768 (7th Cir.1982), and *Donaldson v. O'Connor.*

indicates that there is no other Jacksonville attorney, specializing in civil rights matters, that has the experience or the capability to initiate or prosecute either the *Dunn* case, or a case of similar magnitude.[11]

Earlier, this court quoted Mr. Morrison concerning the "core theory" that has been the basis of the *Dunn* case. He developed this theory during his representation of Rosemary Furman. Thus, it is clear that the *Dunn* case is the unique brainchild of Mr. Morrison. This court is convinced that there is no other counsel in the Jacksonville area that could have undertaken or would have prosecuted the *Dunn* case.

Mr. Joe Sims, a Washington trial attorney with Jones, Day, Reavis and Pogue, testified that "in complex civil litigation, federal court civil litigation, the hourly rate for lawyers in Washington, D.C. would range anywhere from $150 to $175 at the very lowest end of that range, probably to about $350, or $400 at the very highest end of that range." Mr. Harris Dittmar, counsel for the defendant The Florida Bar and whose office is in Jacksonville, testified that his usual hourly rate is $200, and that he personally knows of no one who charges as much as he does in Jacksonville.

Considering the applicable law and the evidence in the record, the court determines that a reasonable hourly rate for Mr. Alan Morrison's services is $200. The top of the Jacksonville line (Dittmar) hourly rate of $200 is not an out-of-line hourly rate for Washington based Morrison. He was able to identify only one case in which he has been awarded fees, calculated on an hourly rate, as high as $215 an hour. Two hundred dollars represents a 7½% reduction from Mr. Morrison's requested hourly rate. Each of the other plaintiffs' attorneys' hourly rates, requested by the plaintiffs, shall be reduced by the same 7½%, rounded off to the nearest five dollars.

As a related subject, it is further determined that since Mr. Morrison resides in Washington, it is appropriate and reasonable to reimburse Mr. Morrison for his reasonable round-trip travel expenses between Washington, D.C. and Jacksonville, Florida.

Since Mr. Sheppard is shown to be a qualified civil rights attorney, defendant The Florida Bar argues that Mr. Morrison is not entitled to travel time expenses, *citing Johnson v. University College of the Univ. of Alabama in Birmingham*, 706 F.2d 1205, 1208 (11th Cir.1983), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983). On the point relevant to the present question, that case declared "since plaintiffs had the right to retain more than one attorney, the exclusion of out-of-town counsel's travel time is proper only if it was unreasonable not to hire qualified local counsel." But, Mr. Sheppard testified that when he got into this case he told Mr. Morrison, "If our firm does this Ms. White is going to have to be the lead, because I simply don't have the time because of my responsibility to these inmates." Although Ms. White is qualified to serve as local counsel to Mr. Morrison, her three years at the bar at the time *Dunn* was filed did not qualify her to act as principal attorney. Therefore, *Johnson* is not apposite.

### III.

### C.

Only one major question has been raised by the defendant The Florida Bar as to the number of hours which Mr. Morrison records as being expended

Mr. Morrison testified that he included in his fee application up to 15 hours of time attributable to his participation in the rule making process before The Florida

---

11. Defendant The Florida Bar notes that the "Middle District of Florida extends to the Orlando and Tampa areas, and plaintiffs presented nothing to indicate there were not experienced civil rights attorneys in those locales who could have handled this case at the prevailing market rates in the Middle District of Florida." But then, in the next sentence, defendant The Flor-

ida Bar says that Mr. Morrison should be compensated "at the prevailing local rates." It is evident he is referring to Jacksonville Division's hourly rates. The court determines this is the local community and plaintiffs need only show the absence of an available and qualified civil rights lawyer in the Jacksonville Division.

Supreme Court (Tr. 53–54). This time should, of course, be deleted from the fee request.

While these hours were beneficial to the class he represented, it is correct that the time was spent in preparing his written comments to the Supreme Court of Florida, which suggested some word changes in The Florida Bar's proposed revised Unlicensed Practice of Law Rule. Since the hours were not officially incurred in the *Dunn* case, it is held that these hours should be deducted from Mr. Morrison's total hours.

## III.

### D.

■ In his affidavit, Mr. Morrison asserts at paragraph 22

I also wish to make one other observation about this litigation. The theory had never been attempted by any lawyer in any case of which I am aware. It was entirely novel and faced substantial legal barriers to success....

Mr. Morrison's affidavit stated that the "theory" was "entirely novel and faced substantial legal barriers to success." It is for this reason that this court has approved an hourly rate of $200, where, except for the allowance of $215 in one case, the next highest rates awarded to him were fixed at $150 to $175 an hour. *Pennsylvania v. Delaware Valley Citizens Council*, 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986) (*Delaware Valley Citizens Council I*), notes

... [W]e specifically held in *Blum* [*v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)], that the "novelty [and] complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the "results obtained" from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award. *Id.* at 898–900, 104 S.Ct. at 1548–1550.

*Norman v. The Housing Authority*, 836 F.2d 1292, 1302 (11th Cir.1988) directs the district court to "determine whether the

fee arrangement was contingent," *citing Pennsylvania v. Delaware Valley Citizens Council*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley Citizens Council II*). There, the Supreme Court concluded

Before adjusting for risk assumption, there should be evidence in the record, and the trial court should so find, that without risk-enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market. Here there were no findings.

*Id.* 107 S.Ct. at 3089.

Mr. Morrison further states in his affidavit

In my view, if our office had not agreed to undertake this lawsuit, it would not have been undertaken at all.

This statement is consistent with this court's earlier finding that the "core theory" of this case was the "brainchild" of Mr. Morrison. Nevertheless, Mr. Morrison has not stated, and the plaintiffs have not offered other evidence that "without risk-enhancement plaintiff would have faced substantial difficulties" in getting Mr. Morrison to file and prosecute the *Dunn* case. He has made it clear that he had the "core theory" before he had Serena Dunn as a client. Hence, applying the rule of *Delaware Valley Citizens Council II*, the record does not permit the court to grant plaintiffs' request for fee enhancement.

## III.

### E.

■ *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983), holds "that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988" and "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."

In the Third Amended Complaint, the plaintiffs asked the court to issue an order "declaring that the Florida rules precluding

lay assistants from aiding plaintiffs and the other members of the plaintiff class in obtaining dissolutions of their marriages violate plaintiffs' rights under the equal protection and due process clauses ..." and "enjoining the defendants from enforcing restrictions on lay assistants aiding plaintiffs ... in exercising their rights to obtain a dissolution of marriage."

In their memorandum of October 26, 1987, they contend

> [p]laintiffs had prayed for an injunction against the continued enforcement of the Rules on unauthorized practice of law, and the defendants, in effect, gave them that result by changing the Rules to remove the objectionable features.

During Mr. Morrison's March 24, 1988 testimony, and in the post-hearing memoranda, it has become evident that the parties are in vigorous dispute over the extent of relief, sought by the plaintiffs, which has been achieved by the Rule change. Thus, Mr. Morrison was cross-examined

> Q. Mr. Morrison, doesn't the rule permit limited oral communication?
>
> A. Yes.
>
> Q. But that communication is limited, is that correct?
>
> A. There are some limitations on it, yes.
>
> . . . . .
>
> Q. So, it, in fact is restricted to eliciting factual information?
>
> A. Correct.
>
> . . . . .
>
> Q. In other words, if she wanted alimony, she—a lay assistant could not type in that request under [Rule] 1.943(a)?
>
> A. I do not believe that's necessarily so.
>
> Q. Well, then, where is the provision that allows a lay assistant to type that kind of information or request?
>
> A. .... In my opinion, there would be nothing that would prohibit someone from doing precisely that if the question was, all they asked for was in the wherefore clause, to add a petition, to add a request for alimo-

ny visitation rights, or something along that line.

Continuing Mr. Taylor's cross-examination

> Q. Wouldn't that be—wouldn't then the lay assistant be drafting paragraphs in that document and asking for certain legal relief from the court?
>
> A. In my opinion, that would be authorized by the rule, and I certainly hope the Florida Supreme Court did not intend to be parsimonious in the relief that it granted that they would make that unauthorized.
>
> Indeed, if I had believed that that was not authorized, I would not have dropped the case.
>
> Q. Well, isn't the clear words of the rule, in the amendment to the UPL rule, state that the oral communications is restricted to those communications to elicit factual information necessary for the filling out of forms?
>
> A. To complete the forms, yes, that what it says.
>
> Q. So, in other words, getting factual information on child support, alimony, and putting them on a blank piece of paper where there is no fill in the blanks, is not legal drafting?
>
> A. I don't know whether it's legal drafting or not. All I know is that, in my opinion, that would be authorized by the rule, period.

Finally

> Q. If I understand your testimony correctly, Mr. Morrison, is that the taking of factual information means more than just filling in blanks, on a form, that have been provided by the Supreme Court?
>
> A. It would largely include that, but that there are certain additional matters directly related to the matters covered by the form that, in my opinion, could properly have been done by the lay assistants, under the revised rule, in the spirit in which it was given.

In the plaintiffs' post-hearing memorandum, plaintiffs' counsel supplements his testimony

> Moreover, as Mr. Morrison explained, id., [TR 98–104] he sees that nothing in the

Rule or in the forms that precludes paralegals from providing supplemental information in response to direct factual questions necessary to complete the forms for the particular client.

Defendant The Supreme Court directs the second half of its post-hearing memorandum to "Plaintiffs' erroneous perception of the change in the Florida Rules of Court and the misperception of what forms can be utilized by lay assistants." This takes seven pages. These excerpts are particularly pertinent.

.... [I]t was established in the hearing of this case that the Plaintiff class would not, because of its restrictions, be able to use the simplified procedures set out in Rule 1.611(c) and, thus, unable to use Forms 1.943(b) through 1.943(e), created and approved by the Supreme Court. Then in his testimony, Mr. Morrison, in particular, claimed that under the change to Rule 10–1.1(b), a lay assistant can take any form, such as Form 1.943(a), Florida Rules of Civil Procedure, and fill out the form for one of the Plaintiff class allowing that person to obtain a divorce. (T: 93—994 and 98—103). Recited in full, including the notes, form 1.943(as) states:

### PETITION FOR DISOLUTION [sic] OF MARRIAGE

The petition of A.B. shows:

1. This is an action for dissolution of the marriage between petitioner and respondent, C.D.

2. Petitioner has been a resident of Florida for more than six months next before the filing of the petition.

3. Petitioner and respondent were married to each other on —————, 19__ at (place of marriage).

4. The marriage between the parties is irretrievably broken.

WHEREFORE petitioner demands a judgment dissolving the marriage.

NOTE: Allegations about joint property, alimony, custody, attorney's fees and temporary relief are ommited [sic] from this form *and must be added when proper.* Verified allegations or an affidavit must be used when child custody is an issue. *See,* § 61.132, Florida Statutes (1979). (emphasis supplied)

One can see from the Form and the accompanying note that allegations concerning property, alimony, child support, custody, visitation, temporary relief and attorneys' fees are "omitted from this form and must be added where proper." This form is *not* a legally complete form. Who does Mr. Morrison intend to add those missing items; the lay assistant! Yet by the very definition, the adding of any allegations to this Form would not only require the collection of factual information but would require the interpetation [sic] of the raw data and the application of the collected facts to the statutes and case law in deciding what is to be alleged and relief requested. This is clearly the giving of advice. *Florida Bar v. Mills,* [398 So.2d 1368 (Fla.1981)] *See also, The Florida Bar v. American Legal & Business Forms, Inc.,* 274 So.2d 225 (Fla.1973). In addition, the selection of this Form and its completion to achieve the legal rights sought by the Plaintiff class member is legal drafting. *See, In re Florida Bar, supra* (layman making changes in legal forms to fit the specific factual needs of another is practice of law). *But,* is this the only form a person in a contested divorce or a divorce with children needs to file with the trial court? Who is to make that determination? Who is to select the approriate [sic] type of form to meet the need of the client? Who is to draft the form? The lay assistant?

With the understanding of what is advice and drafting, the intent and purpose of the change to Rule 10–1.1(b) is quite clear. The new Rule permits lay assistants to elicit *factual* information to complete those forms created and approved by the Supreme Court that are legally complete "fill in the blank" type forms, not the wholesale completion of skeletal forms approved by the Supreme Court in a book intended for use by the members of the Florida Bar. What the Bar and Supreme Court did in changing its rules

was to provide all the tools necessary to the lay assistant for the completion of the forms without giving the lay assistant to [sic] opportunity to engage in the "practice of law."

. . . .

Mr. Morrison's interpretation is even more preposterous when one compares his testimony and its implications to the simplified dissolution rule. That rule, Rule 1.611(c), Florida Rules of Civil Procedure, permits those couples without children, and where there is no contest to the divorce, to use the simplified, fill in the blank, forms (Forms 1.943(b)—1.943(e)) to get a divorce. (footnote omitted) Applying Mr. Morrison's position, members of the Plaintiff class, while not qualifying for the simplified procedures or being able to use the Supreme Court created and approved fill-in-the-blank forms, would be able to go to a lay assistant, provide the lay assistant factual information concerning their contested divorce or a dispute over the children and have the lay assistant interpet [sic] the factual information, decide what couse [sic] of legal action was appropriate for that person, select the appropriate forms and draft all the allegations and relief requested for the forms from scratch. It is beyond comprehension that the Florida Bar and Florida Supreme Court, in restricting the class of people who can use the simplified procedures and its prepared, simplified forms, would grant sweeping authority in the unlicensed lay assistants in dealing with that class of persons not eligible for the simplified procedures because of the complexity of their issues.

. . . .

In sum, the Plaintiff class can *not* obtain a divorce through a lay assistant using any form presently in existence.

Of course, it is The Florida Supreme Court, and not this court, which has the power and jurisdiction to authoritatively construe and apply its revised Unlicensed Practice of Law Rule of July 9, 1988. However, it is this court which now needs to make a judgment concerning the meaning and extent of the revision to the Rule in order to pass on the *Hensley v. Ekerhart* issue of the "extent of [plaintiffs'] success."

This court has earlier determined that the Rule revision prosecution of the *Dunn* case and Judge Melton's remarks at the oral hearing of December 2, 1985 was a "substantial factor, or a significant catalyst in motivating" The Florida Bar to seek the Rule revision. The court determines that those remarks, while not providing the precise boundaries of the revised Rule, at least provide a context which should guide this court in construing the revised Rule and in measuring the results the plaintiffs achieved through the Rule revision. The court has noted that Judge Melton's suggested revision did not go as far as plaintiffs asked for on May 5, 1983, namely an "order prohibiting the defendants from enforcing the portion of the unauthorized practice rules that prevents oral communications between lay persons and clients."

In addition, this court concludes that defendant The Supreme Court's statements, quoted *supra* at pp. 1283–84, represent a reasonable construction of the meaning and scope of the revised Rule. Plaintiffs' reading of the revised Rule is too expansive. Combining all of these elements, it is concluded that the plaintiffs have achieved 50% of the relief which plaintiffs sought in their Third Amended Complaint.

Accordingly, it is determined that, were the plaintiffs to have prevailed on the threshold entitlement issue, the court would award as reasonable attorneys' fees one-half of the net fees previously calculated. However, plaintiffs are awarded all of their expenses without a reduction.

IT IS SO ORDERED.